Filed 3/10/15  Short v. Ware CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| STEVEN B. SHORT, et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>CHARLES M. WARE,<br><br>    Defendant and Respondent. | D066484<br><br><br><br>(Super. Ct. No. RIC532610) |


APPEAL from a judgment and order of the Superior Court of Riverside County, Gloria C. Trask, Judge.  Affirmed.

Burkhalter Kessler Clement & George, Alton G. Burkhalter, and Michael Oberbeck for Plaintiff and Appellant Steven B. Short.

Ward & Ward, Alexandra S. Ward; Law Offices of Randall S. Stamen and Randall S. Stamen for Plaintiffs and Appellants Baldy View Members, LLC, Belle Meadows SP 198, LLC, Perris Valley Land Company, LLC, Perris 40 SFR, LLC and Perris 50 SFR, LLC.

Blank Rome, Gregory M. Bordo, Arti L. Bhimani; Law Offices of Hall & Bailey, John L. Bailey and Barbara M. Moore for Defendant and Respondent.

Plaintiffs and appellants, individual Steven B. Short and the limited liability companies he controls, Perris Valley Land Company (PVLC) and Perris 50 SFR, LLC (Perris 50) (sometimes collectively the LLCs, the companies or Appellants),[1] appeal a defense judgment after court trial. Appellants pursued causes of action for damages for breach of fiduciary duty, conversion, unjust enrichment and breach of contract against the remaining defendant and respondent, Charles M. Ware, who was formerly a member of the LLCs, along with Short and another member, former defendant and manager John Ford (who settled before trial). (Former Corp. Code, § 17153 [fiduciary duties owed by manager-member to LLC and members are those of partner].)[2]

The trial court rejected Appellants' claims that Ware, as a controlling majority member, acted wrongfully and caused them damages when he participated in the financial affairs of the LLCs, together with manager Ford, by locking Short out of the office and replacing him as the second signer of wire transfer instructions on behalf of the

---

[1]    There are three additional LLCs owned by Short who are named appellants, Baldy View Partners, LLC, Belle Meadows SP 198, LLC, and Perris 40 SFR, LLC. However, all parties agree that these appellate issues only pertain to two of the LLCs, Perris 50 and PVLC, which are the only ones we need to discuss.

[2]    All statutory references are to the Corporations Code unless otherwise stated. The California Revised Uniform Limited Liability Company Act (§ 17701.01 et seq., added by Stats. 2012, ch. 419, § 20) took effect on January 1, 2014, supplementing the Beverly-Killea Limited Liability Company Act (former § 17000 et seq., repealed by Stats. 2012, ch. 419, § 19). We apply former section 17000 et seq., because this dispute arose before 2014. Accordingly, we cite to the former section numbers (unless otherwise indicated).

LLCs, which resulted in the making of fund distributions to Ware and Ford but not to Short. (See *Jones v. H.F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 108, 111 (*Jones*) [" 'Majority shareholders may not use their power to control corporate activities to benefit themselves alone or in a manner detrimental to the minority."].) Appellants contend that when de novo review is applied to certain undisputed facts, either or both Short and the LLCs are entitled to recover the amount of his lost one-third share. (§§ 17254, 17255 [providing for manager or member liability where breach of duty is shown].) They seek reversal of the judgment and remand for further proceedings with directions to apply their interpretations of fiduciary duty and conversion law. They also contend that the attorney fees order must fall with the substantive portions of the judgment.

Utilizing the appropriate standards of review for a judgment after trial where conflicting evidence was presented and factual findings made in the statement of decision, we find no error and affirm the defense judgment as a whole. (*In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 358.)

FACTUAL AND PROCEDURAL BACKGROUND

A. Terms of Operating Agreements and Conduct of LLCs until 2009

The LLCs are land investment companies. PVLC was formed in 2004, with Short, Ford (Ware's stepson), and Ware each owning a 30.667 percent interest, and Fortland, a management company owned by Ford (its manager) and Short, holding the remainder (8 percent). Sections 4.1 to 4.3 of the PVLC operating agreement establish that the business and affairs of the company shall be managed by a single manager, with "full, complete and exclusive authority, power and discretion to manage and control" the

3

company. Under section 3.7 of the PVLC operating agreement, a member who is not the manager shall have no power to participate in the management of the company unless otherwise authorized by the agreement or as expressly required by law (§ 17000 et seq.). The powers of the manager to conduct business are limited in section 4.2.2, e.g., the manager must acquire the approval of a majority in interest of the members to establish different classes of members, or to perform acts in contravention of that PVLC operating agreement. Under section 4.3 of the PVLC operating agreement, the manager shall perform its duties in good faith as would an ordinarily prudent person under similar circumstances, and shall not be liable to the company or another member except for fraud or intentional misconduct.

Generally, members of PVLC shall not have priority over other members as to the return of contributions or as to profits, losses, or distributions. (§ 2.7 of the PVLC operating agreement.) The manager Fortland (controlled by Ford) was empowered under the PVLC operating agreement, section 5.5, to have PVLC make distributions to its members. Such distributions are to be paid to the "Members pro rata in proportion to the Member's Membership Interest." (§ 5.5.4 of the PVLC operating agreement.) Section 7.4 of the PVLC operating agreement requires the manager to open company bank accounts and designate the signatories thereon. The PVLC operating agreement contains an attorney fees clause, section 11.10.

Ford formed Perris 50 in 2003, and amended its operating agreement to bring in Short and Ware as additional members, each owning 33 1/3 percent. Perris 50's operating agreement provides that it is a member-managed company. The Perris 50

4

operating agreement requires that distributions to members shall be made in amounts equal to the membership interests. The Perris 50 operating agreement establishes that the managing member, Ford, shall have "full, complete and exclusive authority, power and discretion to manage and control" the company.

PVLC, Perris 50 and another LLC (an appellant but not involved here) sold valuable land for a profit of $33 million. The members agreed that much of the LLCs' proceeds should be deposited into brokerage accounts. Those funds were later transferred to Merrill Lynch. The members agreed with Merrill Lynch that each one of them would be an authorized signatory, and that two signatures would be required for withdrawals from the LLCs' accounts. Ford and Short conducted the business of the LLCs, including signing the Merrill Lynch checks and instructions. Ware did not participate in running the LLC businesses. As of 2009, the Merrill Lynch LLCs' accounts held a balance of about $5 million.

## B. Disputes Arise; Complaint; Ware's Cross-Complaint

In February 2009, Short and Ford had a "falling out" about LLC business practices. Ware owned the building in which they were operating. Ford decided that Short's access to the building and to electronic banking information for the LLCs should be terminated. PVLC's Merrill Lynch account had a balance of $3.4 million, and Perris 50's account had a balance of $1.6 million. Ford believed that Short had written himself an unauthorized check from another one of their LLC companies and then told Ford, "I'm done," which Ford understood as meaning Short took money and was leaving.

5

In June 2009, Ford and Ware instructed Merrill Lynch that Short was no longer an authorized signatory on the LLCs' accounts and his access to information about the accounts was terminated. Ware replaced Short as the provider of required second signatures for the LLCs' Merrill Lynch transactions (wire transfers), and did so at Ford's requests.

Ware and Ford signed Merrill Lynch cash transfer forms accomplishing distributions of $1 million each to Ware and Ford from PVLC. From Perris 50's Merrill Lynch account, Ware and Ford distributed to themselves $400,000 each.[3] This left about the same amount in the LLC accounts as would have represented another one-third share for a member (approximately $1.475 million; referred to here as the "2009 post-distribution Merrill Lynch remaining funds"). At that time, Ford anticipated that eventually Short would be receiving a distribution, once any offsets were calculated from LLC money that Short had advanced to himself. Ware did not ask Ford why Short's distribution was not being made at that time.

Ford consulted another accountant for review of the LLCs' transactions, and they formed the opinion that Short had been over-distributed or had made insufficient contributions to the LLCs. Ford decided that he and Ware would make another 20-plus transfer authorizations that utilized most of the 2009 postdistribution Merrill Lynch remaining funds. In that way, Ford paid off some debts of PVLC and Perris 50. He also

[3]    In December 2009, Ford and Ware transferred an additional $75,000 each of LLC money to themselves. Although Ford operated through Fortland in these PVLC transactions, and individually as a manager member for Perris 50, Appellants do not seek to distinguish between Ford and Fortland in any significant respect. (See fn. 6, *post*.)

paid off debts that he and Short jointly owed on some of their other businesses, based on their personal guarantees.

In one of the related LLC transactions (called the "Perris Lot Sales," "Acacia Grove," or the "Rastogi deal"), Ford used some of the 2009 postdistribution Merrill Lynch remaining funds to pay off other Ford/Short debts. Because Ware's money had been used to make Ford's and Short's personal guarantees in that deal, the parties agreed that Ware would receive $456,494 reimbursement for his interests.[4] Short viewed such an arrangement as a breach of the operating agreements or of that separate contract.

In July 2009, Short sued Ware, Ford, Fortland and the companies, alleging on an individual basis, and derivatively for the companies, that improper distributions had been made, and this, along with the payment of loans, bills and expenses for non-LLC entities, amounted to breaches of fiduciary duty, breaches of contract and/or conversion of the 2009 postdistribution Merrill Lynch remaining funds. A few months later, Ford and Ware filed cross-complaints. Short obtained a temporary restraining order in March 2010 to restrict Ford and Ware from making further disbursements of LLC money.

On advice of their accountant, Ware and Ford approved 2009 tax returns for the LLCs that changed the designation of the $1.475 million paid to each of Ware and Ford

---

[4]    The record has been augmented with exhibit 40, a copy of the August 2009 Perris Lot Sales agreement, allocating $456,494 proceeds to Ware. Short claimed that this constituted a breach of the operating agreement, but the trial court found against that claim. On appeal, Short has not specifically pursued his breach of contract theory concerning this issue. However, he seems to make related claims about the allocation of those proceeds in connection with his conversion claims regarding the 2009 postdistribution Merrill Lynch remaining funds.

7

from "distributions" to advances (loans). The accountant had concluded that treatment of the money as advances was necessary because Short had not received a pro rata distribution, as would normally have been required by the operating agreements. In his discovery responses, Ware was inconsistent in how he characterized that sum.

## C. Settlement with Ford in 2011

In July 2011, Short settled his claims against Ford and Fortland, paying them $1 in return for the transfer of the five LLCs (Appellants here) back to Short's control. After Ford settled the case in July 2011, a relatively small amount of cash from the 2009 post-distribution Merrill Lynch remaining funds was left, although when the LLCs were transferred to Short, they held several real property assets. Ford dismissed his cross-complaint against Short. Short filed a sixth amended complaint that reflected the settlement terms, that he had come into possession of the LLCs and was alleging claims on his own and their behalf.

As later shown in Short's cross-examination of Ford, the parties disagreed on whether the LLCs' real property assets that Short obtained in settlement currently had positive equity. Ford took the position that the LLCs' assets were always worth more than the $1.475 million that Short was claiming as a one-third interest (the 2009 post-distribution Merrill Lynch remaining funds).

## D. Ware Goes to Trial; Statement of Decision

In January 2012, Short and Ware went to a bench trial on several causes of action only, as pled in the sixth amended complaint. Short mainly pursued theories of breach of fiduciary duty and conversion. To some extent, Short also argued a breach of contract of

8

the operating agreements and/or of a separate contract allocating a portion of the proceeds to Ware in the Perris Lot Sales.

The LLCs proceeded against Ware on their claims for breach of fiduciary duty, breach of contract, unjust enrichment, negligence and conversion. The court bifurcated other claims of Appellants (fraudulent transfer), as well as the Ware cross-claims for an accounting and involuntary dissolution of the LLCs, all to be tried later if necessary.

At trial, all three former members of the LLCs testified, as did other witnesses, such as their accountant. Short set forth his analysis of the transactions. He was locked out of the office after he went on vacation in February 2009, and later, Ware told him that Ford was holding his share of the distributions for him. After Short settled with Ford in July 2011, he learned that there was $98 cash from the 2009 postdistribution Merrill Lynch remaining funds (PVLC) and $2,600 cash (Perris 50 account), because Ware and Ford had transferred all the money out of them. The money had been spent by Ware and Ford on a number of different things, without any approval by Short. When Short asked Ware why they were doing this, Ware answered, "I didn't spend my money. I spent your money."

In Ware's testimony, he characterized himself as a silent partner who provided the money and let "the boys" (Ford and Short) run the businesses without his participation or interference in company decisions, although he anticipated that an accounting might be supplied later. He testified that before the 2009 falling out, both Short and Ford had made some transfers of LLC monies to some of the other 13 unrelated companies they alone owned, without consulting him. He believed that some of the $1.475 million 2009

9

postdistribution Merrill Lynch remaining funds, that Ford had left for Short pending an accounting, might not have been due to Short because Short had wrongfully taken other money from the companies.

Ware called Ford as a witness under subpoena, since Ford had settled out. The court excluded testimony about whether Short had previously unlawfully taken money from the LLCs, but allowed Ford to testify that his conduct as manager was based upon certain things, including his consultation with an outside CPA. Ford testified that those consultations led him to believe that Short had either undercontributed or had been overdistributed in the LLCs, by approximately $1.7 million. He calculated the cash distributions to himself and Ware accordingly. Ware did not participate in the distribution decision.

Ford then testified that he had used the 2009 postdistribution Merrill Lynch remaining funds towards paying off debts of entities that he and Short alone owned, i.e., $12 million worth of personal guarantees they had made jointly and severally. Ford testified that he told Ware about his decision to use between $900,000 and $1 million to pay off those debts and loans. Ford thought it was in the best interests of the companies and of Short and Ford to pay off those obligations.

Evidence at trial showed that at the time of the 2009 falling out with Short, around $3.4 million for PVLC and $1.6 million for Perris 50 was in their accounts. Of the 2009 postdistribution Merrill Lynch remaining funds, about $31,716.64 was spent on those two LLCs' bills and expenses. Thus, Ford used much of the 2009 postdistribution Merrill

10

Lynch remaining funds to retire obligations of other Short/Ford entities, in which Ware had no interest.

A February 2011 appraisal of the real properties now owned by the LLCs, that had been returned to Short's control through settlement (along with limited cash), had shown they were of low value. Ford believed that their value had risen by the time of that settlement, July 2011.

In connection with their breach of contract claims, the LLCs argued that both Ford and Ware had made loans to themselves (not "distributions") out of the LLCs' funds, causing the LLCs to become insolvent and unable to reimburse Short his one-third share. Referring to unspecified sections of the Corporations Code, the LLCs requested that the transfers that had been made to Ware be sent back to the LLCs, so that the loans to him would be repaid.

The trial court admitted the operating agreements and other exhibits into evidence. After hearing argument, the court advised the parties of its tentative decision, as follows. The court ruled that the amounts that Ford caused to be paid to himself and Ware were LLC distributions, not loans. There were no breaches of fiduciary duty by Ware because he was not a "manager" under the terms of the operating agreements. Ware's financial activities did not constitute forming a voting bloc with Ford to somehow create a breach of fiduciary duty.

Further, no conversion of funds had been proved because Ware was entitled to receive his own distribution from the LLC, as determined by the manager, Ford. In support of its conclusions, the trial court expressly relied on Ford's testimony about his

11

beliefs that Short had improperly taken money for himself, and how Ford decided in response to wind the company down by making distributions to Ware and himself. At that time, there was still a sufficient amount of 2009 postdistribution Merrill Lynch remaining funds to distribute an equal or lesser amount to Short, and Ford had planned to make an accounting of any offsets for which Short should be held responsible. The court did not find that the Merrill Lynch requirement for two signatures to transfer funds had served to create a voting bloc or constituted a breach of fiduciary duty, nor did other evidence show that Ware undertook or owed such a duty.

The court then clarified that the claims of both Short and the LLCs were without merit, and the LLCs had not been rendered insolvent by the distributions. Although Short claimed the 2009 post-distribution Merrill Lynch remaining funds and LLC assets were inadequate to satisfy his claims, he had not presented evidence to that effect.

To the extent that the LLCs were pursuing their own breach of contract theory, the trial court rejected it because Ware had not violated the operating agreement. In rendering its tentative decision, the court focused on Ware's activities, while commenting that there was an empty chair in the courtroom, representing Ford, and that no decisions about the propriety of his activities could now be made, since he had settled the case. Although the court anticipated that the cross-complaint's issues about an accounting and involuntary dissolution of the LLCs remained to be resolved, eventually, Ware dismissed his cross-complaint.

The LLCs requested the trial court to provide a statement of decision about whether the disbursements had violated the Corporations Code or the operating

12

agreements. The court directed Ware's attorney to prepare a draft statement of decision, and adopted it over Short's objections.

In the statement of decision, the court concluded that Ware did not owe any fiduciary duty to the LLCs or to Short, and one was not created by the banking activities: "[H]e did not form a 'voting bloc' with Ford and did not act in concert with Ford to control the corporation to Short's detriment."

Next, the trial court stated: "Ware did not wrongfully receive his share of the Distributions," and "did not wrongfully take the LLCs' money." There was no proof that he had committed conversion of property.

On the breach of contract and related claims, the statement of decision concluded that "Ware did not vote for the Distributions," and there was no violation of the LLCs' operating agreements when he received his one third-distribution. The court acknowledged that the LLCs had not pleaded a cause of action based on sections 17254 and 17255, but then ruled on the issues as presented at trial. However, those arguments were unsuccessful, because the statutory requirements for a return or repayment of those distributions by Ware were not satisfied. The distributions had been made by Ford in his managerial capacity, and it was not improper or a violation of the operating agreements for Ware to receive his share. In conclusion, the companies were not made insolvent by the distributions and Ware was not responsible for any failure by Ford to make distributions to Short.

Later, the trial court granted Ware's motion for contractual attorney fees, on the basis he was the prevailing party. He was allowed to recover from Short and PVLC

13

(based on its attorney fees clause), jointly and severally, $376,500 for reasonable attorney fees. Ware also recovered from Short and the LLCs, jointly and severally, $11,176.15 for costs.

The appeals filed by Appellants were consolidated. The record was augmented to include items inadvertently admitted, including trial exhibit 40 (the Perris Lot Sales contract). The case was then transferred to this court.

DISCUSSION

I

*RULES OF REVIEW; STATEMENT OF DECISION*

Appellants argue that a de novo standard of review applies, based upon a given set of undisputed facts they set out from Ware's testimony. (See, e.g., *Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [application of law to undisputed facts is subject to de novo review]; *Topanga and Victory Partners v. Toghia* (2002) 103 Cal.App.4th 775, 780.) In particular, they argue Ware conceded that he acted together with Ford to make distributions to only two out of three LLC members. From that concession, Appellants argue those actions as a matter of law amounted to violations of various obligations owed by one member to another.

That was not the only evidence presented, however. The trial court's statement of decision was issued after the court heard testimony from Ware, Short and Ford, and then interpreted the LLC operating agreements and other documents as necessary to resolve the issues presented. Even though the provisions of section 17255 had not been cited in the pleadings, the court allowed argument on whether the LLCs should be made whole by

14

a refund of the advances or "loans" made to Ware, as issues related to the LLCs' breach of contract and unjust enrichment claims.

Unfortunately, neither Short nor the LLCs has adequately complied with the requirements of California Rules of Court,[5] rule 8.204(a)(2)(C), that an opening brief must "provide a summary of *the significant facts* limited to matters in the record." (Italics added; see *Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856.) Both opening briefs have omitted or glossed over essential, significant background evidence heard by the trial court, about the circumstances of the 2009 "falling-out" between Short and Ford, after which Short was removed by Ford and Ware from the position of signing wire transfer forms for the LLCs' Merrill Lynch bank accounts. Although the court did not find it necessary to make any findings on whether Short had improperly taken money from the LLCs' accounts while he still had the power to do so, the court heard extensive evidence about Ford's rationale for his managing decisions to make distributions and then spend some or most of the 2009 postdistribution Merrill Lynch remaining funds on retiring debts attributable to these and other Short and Ford businesses, which Ford characterized as being in the best interests of the LLCs and Short. On the record presented, it is not possible to fairly evaluate the breach of fiduciary or conversion claims or the LLCs' breach of contract claim without a fuller understanding of the record as a whole, as it pertains to Ware's role in it.

---

[5] All further rule references are to the California Rules of Court unless noted.

Accordingly, it is not appropriate to take Appellants' requested de novo approach for applying principles of law to a given set of facts, since their "sets" are incomplete and omit significant disputed facts. Instead, where the key documentary and statutory interpretation issues were decided on conflicting evidence, and by means of a statement of decision, "any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision." (*In re Marriage of Hoffmeister, supra,* 191 Cal.App.3d 351, 358.) The ultimate facts found in the court's statement of decision necessarily include findings on the intermediate evidentiary facts that sustain them. (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1125 (*Muzquiz*).)

Because of the credibility issues involved at trial, under substantial evidence principles, " ' "every intendment and presumption not contradicted by or inconsistent with the record on appeal must be indulged in favor of the orders and judgments of superior courts." ' " (*Jara v. Suprema Meats, Inc.* (2004) 121 Cal.App.4th 1238, 1250 (*Jara*), citing *Walling v. Kimball* (1941) 17 Cal.2d 364, 373.) "If the trial court's resolution of the factual issue is supported by substantial evidence, it must be affirmed." (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.)

"[T]he power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. *If such substantial evidence be found,*

16

*it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion*." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.) We may not reweigh the evidence and are bound by the trial court's credibility determinations. (*Ibid*.; see *Heller v. Pillsbury Madison & Sutro* (1996) 50 Cal.App.4th 1367, 1384.)

Utilizing this approach, we first outline basic rules governing these LLCs, with attention to the obligations of a member such as Ware toward other members. We then turn to the fiduciary duty, conversion, and statutory or contract theories argued on appeal. (Pts. III-V, *post*.)

II

*LLC FRAMEWORK*

" ' "A limited liability company is a hybrid business entity formed under the Corporations Code . . . [which] provides members with limited liability to the same extent enjoyed by corporate shareholders [citation] . . . ." ' " (*People v. Pacific Landmark, LLC* (2005) 129 Cal.App.4th 1203, 1211; *PacLink Communications Internat., Inc. v. Superior Court* (2001) 90 Cal.App.4th 958, 963 (*PacLink Communications*).) LLCs have members who own membership interests, but the company has a legal existence separate from the members. (*Ibid*.) The articles of organization or the operating agreement may provide for member operation and control, or may state that management shall be provided by a member or manager or third party manager. (§ 17151, subd. (a); 9 Witkin, Summary of Cal. Law (10th ed. 2005) Partnership, §§ 164-165, pp. 723-724.)

Current section 17704.09, which applies to cases arising after 2014 (not this case; see fn. 2, *ante*) sets out in great detail the contours of the fiduciary duties and other standards of conduct for members and managers (see, e.g., its subd. (a) ["The fiduciary duties that a *member* owes to a member-managed limited liability company and the other members of the limited liability company are the duties of loyalty and care under subdivisions (b) and (c)," italics added]). However, we are interpreting former section 17153, which was more limited in scope and states only that the fiduciary duties *a manager owes to the LLC and to its members* are those of a partner to a partnership and its partners (without mention of member-to-member duties).

As applicable here, Ford the effective manager of the LLCs, owed fiduciary duties to the company and its members, similar to the duties owed by a partner to a partnership and to other partners. (§ 17153.) Short relies on analogous corporate case law to provide standards for assessing Ware's duties toward Short. *Jones, supra,* 1 Cal.3d 93, 108, 111 stands for the proposition that a corporation's controlling shareholders owe a comprehensive duty to minority shareholders to act with "good faith and inherent fairness," in entering into any corporate transaction in which control of the corporation is materially affected. (*Id.* at p. 112.) Short compares the activities of Ware as a member of the LLCs to the exercise of powers by a controlling majority of corporate shareholders, due to the management structure of the LLCs and the separate requirements of Merrill Lynch for two signatures for authorizing disbursement of LLC funds.

We accept the idea that analogous principles of corporate law on the duties of corporate shareholders would allow a member of an LLC to be subjected to liability

18

arising from individual tortious conduct, or on similar alter ego principles. (*People v. Pacific Landmark, supra*, 129 Cal.App.4th 1203, 1211-1212; § 17101.) Here, as in *Jara, supra*, 121 Cal.App.4th 1238, 1252-1253 (a close corporation case), "[t]he parties do not question the basic principle of the fiduciary duty owed by majority shareholders to minority shareholders. As stated in *Jones[, supra,]* 1 Cal.3d 93, 108, California courts 'have often recognized that majority shareholders, either singly or acting in concert to accomplish a joint purpose, have a fiduciary responsibility to the minority and to the corporation to use their ability to control the corporation in a fair, just, and equitable manner. Majority shareholders may not use their power to control corporate activities to benefit themselves alone or in a manner detrimental to the minority.' " Thus, in *Jara*, the court relied on *Jones* "as allowing a minority shareholder to bring a personal action alleging 'a majority stockholders' breach of a fiduciary duty to minority stockholders, which resulted in the majority stockholders retaining a disproportionate share of the corporation's ongoing value.' " (*Jara, supra*, at pp. 1257-1258.)

Since both Short and the LLCs are plaintiffs and appellants, we also rely on *Jones, supra*, 1 Cal.3d 93 for its explanation of when it is appropriate for an individual action to be brought, or a derivative action filed, under such alleged circumstances of majority abuse of power. The policy considerations favoring a derivative action include the "objective of preventing a multiplicity of lawsuits and assuring equal treatment for all aggrieved shareholders." (*Jara, supra*, 121 Cal.App.4th 1238, 1259-1260 [trial court erred in failing to rule on individual corporate shareholder's cause of action for breach of fiduciary duty, because enough facts were alleged to show that the majority shareholders

19

paid themselves excessive and disguised dividends].)  However, where there is only one

minority shareholder, an individual action to redress individual injury can also be

brought.  (*Ibid.*)

Although the fiduciary duties analyzed in *Jones, supra*, 1 Cal.3d 93 are not exactly

congruent with the duties of one LLC member to another, it is reasonable to assume the

basic principles about the obligations of the majority not to exploit the minority are

generally applicable here.  (See *People v. Pacific Landmark, LLC, supra*, 129

Cal.App.4th 1203, 1211-1212, 1216 [Legislature was presumably aware of case law

concerning corporate officer and director liability when enacting LLC statutes on liability

of limited liability company managers; "there is no indication that the Legislature

intended to confer more protections for managers of limited liability companies than for

corporate officers and directors"].)

In any event, arguments are now presented about both Short's individual claim to

the amount of the distributions, and the LLCs' claims of misspent funds, and the LLCs

join in the issues as presented by Short, as well as making their own claims.  (Rule

8.200(a)(5).)  We consider Short's individualized claims and the LLCs' derivative ones

concerning Ware's potential fiduciary duty liability to a fellow LLC member, Short, or to

the LLCs themselves, all asserting minority shareholder-type grievances.  We then turn to

the conversion issues raised, and finally, statutory and contractual claims and the attorney

fees order.

20

III

*FIDUCIARY DUTY OF LLC MEMBER*

A. Short's Arguments

Short attacks the trial court's ruling which stated "as a matter of law that Ware did not owe a fiduciary duty to Short."  He says the trial court wrongfully emphasized that Ware was not a manager, and he did not actually "vote" on these distributions.  Instead, assuming that the principles set forth in *Jones, supra*, 1 Cal.3d 93 must apply equally to LLC majority members as to majority shareholders of a corporation, Short argues that when Ware cooperated with the manager, Ford and/or Fortland, to sign wire transfer instructions to make distributions to only two out of three members, Ware essentially took action as a controlling faction of the LLC.  The analysis of *Jones* would then presuppose that any such action taken in concert by the majority gives rise to a fiduciary duty to the minority, to protect its interests as well.  (*Id.* at pp. 108-111.)[6]

Short argues that Ware made concessions in testimony that he did what the manager Ford asked him to do, by transferring money while in possession of knowledge that Short had a one-third interest in the company but had been locked out, and therefore Ware's participation created a majority (acting in concert to control the LLCs), per se violating the terms of *Jones, supra,* 1 Cal.3d 93.  According to Short, *Jones* would

---

[6]    At oral argument, Appellants drew some distinctions between management of an LLC by a manager or by a managing member.  PVLC's manager, Fortland, was effectively controlled by Ford, although Short also had an ownership interest in Fortland.  The briefs do not differentiate in any significant way between the conduct of Ford or Fortland as a manager.  For purposes of analysis of Ware's role, it is appropriate for us to consider Ford's individual conduct to be the same as his activities for Fortland.

21

require that any use to which Ware and Ford put their combined power to control the LLCs' Merrill Lynch accounts had to benefit the LLCs and all members proportionately. Upon the circumscribed set of facts that he emphasizes on appeal, Short claims he successfully shifted the burden to the majority member, Ware, to carry the burden of proving the good faith and inherent fairness of his actions.

Although the arguments made on appeal are somewhat confusing, for purposes of this fiduciary duty analysis, we focus on the 2009 distributions made to Ware and Ford, and on Ware's participation in them. We construe the arguments presented on fiduciary duty as not including consideration of the later use of the 2009 postdistribution Merrill Lynch remaining funds, which are mainly discussed in the conversion claims.

### B. Analysis: Short

We apply, as adapted here, the principle that "the circumstances of any transfer of controlling shares [or interest] will be subject to judicial scrutiny when it appears that the controlling shareholders [members] may have breached their fiduciary obligation to the corporation [business] or the remaining shareholders [members]." (*Jones, supra*, 1 Cal.3d 93, 115.)

Both the PVLC and Perris 50 operating agreements set forth extensive power in the manager or the managing member, to act for the LLC under "full, complete and exclusive authority, power and discretion to manage and control" the companies. This included the power of making distributions of LLC funds to members, where appropriate.

In the PVLC operating agreement, section 3.7 provides that a member who is not the manager shall have no power to participate in the management of the company unless

22

otherwise authorized by the agreement or as expressly required by law (§ 17000 et seq.). As a member who was not a manager, Ware took his instructions from Ford. Fortland (through Ford) was bound by section 4.3 of the PVLC operating agreement, providing that its manager shall perform its duties in good faith, as would an ordinarily prudent person under similar circumstances.

Short relies on *Jara*, *supra*, 121 Cal.App.4th 1238, to argue that the distributions made operated to deprive Short of his fair share of the companies' income, or that the payment of the Ware-Ford distributions were equivalent to "disguised dividends" that were disproportionate. (*Id.* at p. 1259.) However, Short failed to show that those payments gave rise to his own individual injury, because he did not show that they fell outside the scope of managerial authority of Ford, or that Ware wrongfully participated in them through exercise of a controlling interest. With respect to Ware's potential liability, the trial court impliedly rejected Short's position that Ford had acted in bad faith as a manager, in making the subject distributions to himself and to Ware. The record fully supports that conclusion.

When we apply the rule set forth in *Jones, supra,* 1 Cal.3d 93 "that the comprehensive rule of good faith and inherent fairness to the minority" applies in any LLC transaction where control of the company is material, we find no basis to overturn the trial court's express and implied findings of fact, on which its legal conclusions were based. (*Id.* at p. 112.) We review those findings that underlie the conclusions in the statement of decision for substantial evidence support. (*Muzquiz*, *supra*, 79 Cal.App.4th 1106, 1125-1126.) Here, the trial court heard not only the portion of the evidence that

Short sets forth in this appeal, but also additional evidence about the history of the operations of the LLCs, including various disputes that had arisen among the members. Since Ford had settled the case, only Ware remained as a trial defendant, and the trial court properly focused upon whether Ware was justified in complying with the instructions given him by Ford, the manager/managing member. It was evidently central to the trial court's credibility determinations that Short had given an inadequate explanation of why Ware and Ford believed that offsets against Short's prospective one-third share were appropriate.

Among the evidence that supported the trial court's finding that Ware did not commit a breach of fiduciary duty was the provision in the PVLC operating agreement that the manager should open bank accounts and designate the signatories. Once Ford lost confidence in Short, his authority as manager allowed him to change the signatories for the Merrill Lynch accounts. It is not dispositive that Merrill Lynch regulations required two signatures, and that Short had previously provided one of them. Rather, the emphasis should be on whether the operating agreement terms allowed Ware to follow the instructions of the manager. Participating in transactions by complying with the Merrill Lynch requirement for two signatures for approval of wire transfers was not the equivalent of Ware's exercise of a controlling interest.

By cooperating with the manager, Ware did not create and bring himself within the scope of a fiduciary duty to challenge the exercise of managerial authority, merely because he knew that Short was a one-third member. He also knew that there were significant disputes about offsets and accounting that might apply to the LLCs' assets,

24

and that the disputes were not yet over. In view of the entire record, Short cannot show that Ware wrongfully participated in self-dealing that unlawfully promoted his own interests above those of his fellow member, Short.

In the statement of decision, the court appropriately emphasized that the propriety of Ford's conduct as a manager was not before it. Although some of these LLCs' transactions could be viewed as questionable in many respects, when they are examined as a whole, Short has not made his case that Ware's actions in complying with the instructions of the manager gave rise to or violated a "comprehensive rule of good faith and inherent fairness to the minority." (*Jones, supra*, 1 Cal.3d 93, 112.) Short has not shown how the trial court's conclusions that Ware did not owe him a fiduciary duty were legally incorrect or lacking in substantial evidence support. (*Winograd v. American Broadcasting Co.*, *supra*, 68 Cal.App.4th at p. 632.)

## C. LLC Arguments and Analysis

The LLCs likewise argue that the trial court committed reversible legal error by finding, as a matter of law, that Ware did not owe them a fiduciary duty to protect their interests, over his own. They claim all the essential facts were undisputed and the issue should be resolved as a matter of law, to find that Ware's cooperation with Ford in signing authorizations to make distributions amounted to a majority "vote." They cite to the definitions portion of the LLC statutory scheme, section 17001, subdivision (aq), which stated that a " 'vote' includes authorization by written consent." They argue that the signing of wire transfer authorizations amounts to written consents, and the courts should not prefer form over substance.

25

The LLCs also point to the discrepancy in the positions Ware has taken, in discovery and at trial, regarding the characterization of the $1 million-plus distributions as "advances," not distributions (LLC tax returns for 2009). The LLCs would characterize the distributions as loans, and they asked the trial court to require Ware to pay them back, as damages for breaches of fiduciary duties, or pursuant to principles of unjust enrichment.

It is undisputed that Ware participated in approving fund distributions that were unequal or incomplete at the time they were made, and he did so at the manager's direction. However, we cannot accept the LLCs' arguments that Ware breached a fiduciary duty in doing so, either under *Jones, supra*, 1 Cal.3d 93 or principles of LLC law. The record showing "what Ware knew and when he knew it" does not support any finding on behalf of the LLC that equal distributions were mandatory as of that time, including one to Short, and that Ware had to implement that principle. Rather, Ware was entitled to comply with the manager's request to act as a signatory for the wire transfers, and thus to receive his one-third distribution as allocated by the manager. The testimony of both Ware and Ford communicated to the trial court their beliefs that Short's entitlement to a one-third distribution might, because of previous dealings among the parties, be properly subject to offsets to be resolved in the future, and the court properly considered all that evidence.

Without reweighing the evidence, and accepting the substantial evidence in the record, "contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts," this reviewing court is

26

entitled to accept the trial court's resolution of the disputed factual and legal issues. (*Bowers v. Bernards*, *supra*, 150 Cal.App.3d at pp. 873-874.)  In conclusion, the evidence did not show that the LLCs were required to make any improper distributions or loans to Ware, and they have not shown a basis in the evidence or the applicable law regarding fiduciary duty for requiring him to reimburse them those sums.

IV

*CONVERSION*

A.  Short's Arguments and Analysis

According to Short, the trial court erroneously focused on Ware's receipt of his own one-third share of distributions as amounting to a conversion of Short's prospective share.  Instead, Short argues that he successfully showed that Ware had wrongfully exercised control and dominance over the "earmarked" 2009 postdistribution Merrill Lynch remaining funds.  When Ware cooperated with Ford and signed transfer orders of those funds to third parties (in part, paying other Ford/Short LLC bills and expenses), Ware said he was spending Short's money.

We analyze this claim in light of the usual elements of conversion.  "Conversion is the wrongful exercise of dominion over personal property of another."  (5 Witkin, Summary of Cal. Law, *supra*, Torts, § 699, p. 1023.)  Ordinarily, a generalized claim for money is not considered a usual subject of conversion, because a specific and identifiable sum must be involved.  (*Vu v. California Commerce Club, Inc.* (1997) 58 Cal.App.4th 229, 235; 5 Witkin, Summary of Cal. Law, *supra,* Torts, § 703, pp. 1026-1027.)

27

In *Fischer v. Machado* (1996) 50 Cal.App.4th 1069, liability for conversion was held proper, where two agents had failed to turn over a definite sum to their principals, after it was received for the principals' account. The agent-defendant had received certain proceeds from the sale of plaintiffs' (the principals') consigned farm products, then commingled the funds with the defendants' general corporate account, and thus claimed the money was no longer identifiable or subject to the plaintiffs' dominion and control. The appellate court rejected the contention by the defendants that they could not have converted such proceeds, because "[a]s an agent, defendants had the obligation to turn over the definite sum received by it on plaintiffs' account." (*Id*. at p. 1074.) Those plaintiffs had established the defendants' actual interference with their ownership or right of possession of the readily identified proceeds, and could recover them. (*Ibid*.)

Conversely, if a " 'plaintiff neither has title to the property alleged to have been converted, nor possession thereof, he cannot maintain an action for conversion.' " (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 136 (*Moore*), cited in *Fischer v. Machado, supra*, 50 Cal.App.4th 1069, 1072.) In the case before us, Short had an expectancy that he would be paid a one-third share of the distributions from the LLCs, which is not the same as an identified or earmarked amount being held by an agent on behalf of the principal. (*Ibid*.)

The applicable rules indicate that Short did not prove liability for conversion for either the sum of the one-third distribution as made, or for the spending of the 2009 post-distribution Merrill Lynch remaining funds. Ford as the manager made a determination that Short might not be entitled to receive the specific amount of money representing an

28

initial one-third distribution, based upon alleged earlier violations of Short's duties to other members or to the LLCs. Ware was under the same belief at the time, according to his testimony, and there was evidence to support those determinations. Short's evidence did not show that Ware applied an identifiable sum, to which Short was clearly entitled, for Ware's own use. The funds used for the distributions belonged to the LLCs, which had a legal existence separate from the members. (*PacLink Communications*, *supra*, 90 Cal.App.4th 958, 963.) Ware as a member did not own or convert those funds.

Short cannot properly make a claim of title or right to possession of that sum, which was owned by the entity and subject to management. (See *Moore, supra*, 51 Cal.3d at p. 136.) This record does not support a finding of Ware's liability for conversion as a matter of law, because Short did not bring forward facts showing Ware came under a duty to segregate specific funds that he controlled. (*Fischer v. Machado, supra,* 50 Cal.App.4th 1069, 1072.)

Where a statement of decision sets forth the factual and legal basis for the decision, "any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision." (*In re Marriage of Hoffmeister, supra*, 191 Cal.App.3d at p. 358.) Here, this rule requires the conflicting evidence to be viewed as supporting the finding of no liability to Short on either conversion theory.

B. LLCs' Arguments and Analysis: Conversion; Breach of Contract

Along with Short, the LLCs contend the trial court erred in finding that Ware's conduct in cooperating with Ford, to spend the 2009 postdistribution Merrill Lynch

29

remaining funds "on non-PVLC-related and non-Perris 50-related loans, bills, and expenses," did not amount to Ware's conversion of those funds. In addition, the LLCs argue that the one-third distributions made to Ware should be reimbursed to the LLCs, to remedy their current lack of resources. The LLCs argue Ware should be liable not only to them but also to Short.

For the same reasons set forth above about Short's conversion claim, the trial court had a sufficient basis in the evidence to conclude that the LLCs could not establish that a specific and identifiable sum of money was to be credited and paid to Short, and consequently was due to the LLCs from Ware. (*Vu v. California Commerce Club, Inc.*, *supra*, 58 Cal.App.4th 229, 235.) Instead, the 2009 postdistribution Merrill Lynch remaining funds were fluid and subject to Ford's management, as provided in the operating agreements (except as specified in the March 2010 temporary restraining order; no issues about that were raised here).

In any case, the distributions made to Ware in 2009 were not shown to be wrongfully received. Further, the trial court had an adequate basis in the evidence to find that the payments of other Ford/Short LLC expenses, initiated by Ford with the assistance of Ware, did not amount to Ware's violation of the operating agreements for these LLCs, and that Ware did not act unlawfully in that respect. The evidence showed that those payments were made as a result of other disputes between Ford and Short in the same types of business dealings. We conclude that the trial court did not draw inappropriate legal conclusions about Ware's lack of liability on the evidence presented about conversion.

30

*LLCS' ADDITIONAL ARGUMENTS ON SECTION 17255 AND
BREACH OF CONTRACT; ATTORNEY FEES ORDER*

In the statement of decision, the trial court noted that the LLCs did not specifically plead a statutory theory about the applicability of section 17255 for creating liability of Ware. The court nevertheless reached the issue, which the LLCs argued to it in connection with their breach of contract, negligence and/or unjust enrichment allegations. We disagree with Ware's respondent's brief that this argument was waived, as not adequately brought before the trial court in the pleadings, since the record shows that it was addressed during trial.

On appeal, we inquire whether the trial court erroneously ruled that sections 17254 and 17255 were not violated by Ware's signing of wire transfer instructions. The LLCs' claim Ware's actions caused the making of "improper and prohibited distributions to Ware and Ford," due to statutory violations and/or breach of the operating agreements. Although their theories are not entirely clear, the LLCs do not appear to claim in this connection that the spending of the 2009 postdistribution Merrill Lynch remaining funds was a violation of section 17255.

Under section 17255, manager/member liability to the LLC may be imposed where a breach of duty is shown, and where the statutory requirements for a return or

repayment of those monies are satisfied. (See current § 17704.06; fn. 2, *ante*.)[7] Former sections 17254 and 17255 allowed liability for making improper LLC expenditures to be imposed under the following circumstances. Section 17255, subdivision (a) provided that a member or manager who voted for a distribution that was in violation of the operating agreement, or other statutory rules (e.g., § 17254), "is personally liable to the limited liability company for the amount of the distribution that exceeds what could have been distributed without violating section 17254 . . . or the operating agreement if it is established that the member or manager did not act in compliance with Section 17254."

The LLCs argue the evidence showed Ware, in authorizing the wire transfer payments, incorrectly "voted" for a distribution that violated the LLCs' operating agreements or section 17254. They claim he failed to comply with section 17254 in two ways. First, LLC officials may not make a distribution that would prevent the LLC from being able "to pay its debts as they become due in the usual course of business" (§ 17254, subd. (a)(1)). Next, section 17254, subdivision (a)(2), provides in relevant part that LLC officials may not make a distribution if it would bring the LLC's total assets below the sum of its total liabilities.

At trial, the LLCs mainly claimed that the advances or "loans" to Ware should be paid back to them. The LLCs also claim on appeal that the trial court failed to recognize that Ware's actions in signing the wire transfer instructions (aka "voting") prevented the

---

7    In section 17255, subdivision (a), the terms of section 17353 are also mentioned as subject to possible enforcement, but section 17353 deals with winding up of LLCs, and it is not claimed to apply here.

LLCs from paying their debts as they became due. They point to LLC balance sheets in the record for 2009 to 2011, to argue the LLCs were underfunded as of the time the 2009 Ware/Ford distributions were made. They make some complicated calculations aimed at showing that Ware should have been held liable for at least $480,000 to keep the LLCs solvent in 2009, under this statutory provision.

Whatever the LLCs' current theory about applying the terms of section 17255, the trial court was not persuaded by the LLCs' positions, and neither are we. First, when Ware signed the wire transfer instructions, he was not "voting" in a manner that prejudiced the LLCs by violating their operating agreements or rendering them insolvent. Second, the trial court had a sufficient basis (e.g., Ford's testimony) to find that the 2009 payment of the distributions to Ford and Ware did not bring the LLCs' total assets below the sum of their total liabilities. The LLCs did not supply any contrary evidence regarding the fair market value of the companies' assets or liabilities at the times of the distributions. At trial, the LLCs' trial attorney admitted that they were not insolvent. On this point, the statement of decision explains that, to the extent Ford acted wrongfully in not making a distribution to Short at the same time Ware and Ford received theirs, any wrongful conduct would be Ford's failure to distribute to Short, not the making of a distribution to Ware. Ford settled. Therefore, Ware should not be held statutorily liable for those amounts.

The totality of the evidence was that under the operating agreements, Ford exercised his sole and exclusive authority to make distributions, based on his analysis of potential offsets, and he did not consult Ware. It was not demonstrated that Ware knew

33

anything improper was going on.  The LLCs have provided no legal basis for this court to reverse the defense judgment.  Likewise, the attorney fees order is not separately challenged and must stand.

## DISPOSITION

Judgment and order affirmed.  Costs on appeal are awarded to Ware.

HUFFMAN, Acting P. J.

WE CONCUR:

O'ROURKE, J.

AARON, J.

34