[No. B171419. Second Dist., Div. Three. May 31, 2005.]

THE PEOPLE et al., Plaintiffs and Respondents, v.
PACIFIC LANDMARK, LLC et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part I of the Discussion.

COUNSEL

Morton Minikes for Defendants and Appellants.

Rockard J. Delgadillo, City Attorney, Debbie Lew, Assistant City Attorney, and Katharine H. MacKenzie, Deputy City Attorney, for Plaintiffs and Respondents.

OPINION

**ALDRICH, J.—**

## INTRODUCTION

The City of Los Angeles and the People of the State of California (collectively, the City) brought a red light abatement action (Pen. Code, § 11225) against the operators of a business and the owners of the strip mall where the business was located. The action alleged that the business was a front for prostitution and an illegal massage parlor. The trial court issued a preliminary injunction prohibiting the operation of a massage parlor or a house of prostitution. Pacific Landmark, LLC (Pacific), a limited liability company and owner of the property, and Ron Mavaddat, Pacific's manager

(collectively, appellants), appeal, contending that the preliminary injunction is moot because the offending business has vacated the premises, with the result there is no threat of future harm. Mavaddat also contends, as manager of Pacific, that he is exempt from personal liability for any order or judgment against Pacific. (Corp. Code, § 17158.) In the unpublished portion of this opinion (part I), we hold that there was no error in issuing the injunction. In the published portion (part II), we hold that managers of limited liability companies are not immune from personal liability if they have participated in tortious or criminal conduct while performing duties as managers. Accordingly, we affirm the order issuing the preliminary injunction.

## FACTUAL AND PROCEDURAL BACKGROUND

1.  *The City's application for temporary restraining order and preliminary injunction.*

In June 2003, the City commenced the instant action to enjoin and abate a public nuisance. (Pen. Code, § 11225; L.A. Mun. Code, § 11.00, subd. (*l*).) The complaint alleged that an illegal massage parlor was being operated for the purpose of prostitution and as a disorderly house in a strip mall (the premises) located in the Tarzana area of the City, owned and leased by Pacific and managed by Mavaddat. Defendants, Arthur Melikyan, doing business as Victoria's Health Care and/or the Weekly Press, and Zachary Noel Spencer, doing business as Victoria's Health Care (together defendants),[1] were the occupants, operators, and lessees of the premises.

The City sought to permanently enjoin appellants and defendants from maintaining or occupying the premises for purposes of prostitution or operating a massage parlor. The City also requested a civil penalty. (Pen. Code, § 11230.) The complaint alleged that unless enjoined, appellants and defendants would continue to maintain the premises for the unlawful purposes.[2]

The City then filed its application for a temporary restraining order and an order to show cause for a preliminary injunction. The City argued (1) it was likely to prevail at trial on the merits because traditional law enforcement and abatement efforts had failed to eliminate the illegal activity; and (2) harm to the public was presumed from defendants' maintenance of a nuisance per se

---

[1] Defendants are not parties to this appeal.

[2] The complaint also alleged in the third cause of action that defendants were engaged in unlawful and unfair competition under Business and Professions Code section 17200. The appeal, however, does not raise any issues concerning the third cause of action.

as declared by Penal Code section 11225 and Los Angeles Municipal Code section 11.00, subdivision (*l*).[3]

In support of its application, the City submitted 17 declarations and 47 exhibits demonstrating the following:

(A) In July 2001, Pacific leased the premises to Melikyan for three years with an option for a five-year extension. Mavaddat signed the lease on behalf of Pacific. Thereunder, the tenant was to obtain Pacific's written approval for all signs. Pacific retained the right to enter the premises to inspect its condition and the tenant's compliance with laws, ordinances, permit requirements, and the lease. The permitted use was "Medical Therapy Offices." The premises were to be used for the business known as Victoria's Health Care.

(B) Victoria's Health Care has a well-established reputation as a location where illicit activity, notably prostitution, occurs on an open and systematic basis. Defendant Spencer, whose chiropractic license was displayed on the wall in the reception area, was "known to the law enforcement community as a chiropractor engaged in several illegal massage parlor and prostitution operations in the City . . . ."

(C) Posing as customers, plainclothes Los Angeles police officers entered the premises and found a massage therapy business in violation of the permit and zoning requirements. Once the officers were inside the massage rooms, the therapists offered to perform acts of prostitution for an additional fee. The police found new and used condoms hidden in each room of the premises. Between February 2002 and May 2003, the police made 36 arrests at Victoria's Health Care for prostitution (Pen. Code, § 647, subd. (b)), operating a disorderly house (Pen. Code, § 316), being present in a house of prostitution (Pen. Code, § 315), supervising or directing a prostitute (Pen. Code, § 653.23), and unlawfully operating a massage parlor and performing massage therapy within 500 feet of a residential area without permits (L.A. Mun. Code, §§ 103.205, 103.205.1, 12.14.A.1(a), & 12.70C).

(D) Despite repeated and continuous law enforcement efforts, including meetings with the owners' counsel, the police, and the city attorney's office, defendants continued to do business as usual. The city building and safety

---

[3] Los Angeles Municipal Code section 11.00, subdivision (*l*) reads in relevant part: "In addition to any other remedy or penalty provided by this Code, any violation of any provision of this Code is declared to be a public nuisance and may be abated by the City as a nuisance by means of a restraining order, injunction or any other order or judgment in law or equity issued by a court of competent jurisdiction. The City may seek injunctive relief to enjoin violations of, or to compel compliance with, the provisions of this Code or seek any other relief or remedy available at law or equity."

inspector investigated the premises in May 2002 and determined that it was being used to operate an unlawful massage parlor within 500 feet of a residential zone. The inspector issued an order to comply, notifying Pacific of the violations. The order gave Pacific until May 23, 2002, to discontinue the illegal use of the premises. Victoria's Health Care was still operating an unlawful massage business on the premises in January 2003.

(E) In a meeting held in January 2003 with counsel for Pacific, the deputy city attorney summarized the massage parlor and prostitution activity at the premises, and gave an overview of the City's nuisance abatement program and the Red Light Abatement Law. Counsel for Pacific thereafter instructed his client to serve defendants with a notice to perform covenant or surrender possession of the premises. Later that month, Pacific's attorney sent by facsimile a letter indicating that the tenant had requested a change in use from medical offices to business offices for a publication called "the Weekly Press," and promised that the tenants would comply with the lease and conduct a valid business on the site. Nonetheless, the illegal activity continued to occur at the premises as reflected by the arrest reports through May 2003.

### 2. *The temporary restraining order.*

Appellants opposed the issuance of a temporary restraining order. They argued that as lessor, and as manager of the lessor, neither Pacific nor Mavaddat respectively, operated or had an interest in Victoria's Health Care or the Weekly Press, nor engaged in or condoned the conduct associated with those businesses.

In his supporting declaration, Mavaddat averred that he was responsible for leasing the premises to Melikyan. Once informed of the activities occurring at Victoria's Health Care, appellants fully cooperated with law enforcement to remedy the situation. Mavaddat served a notice to quit on Melikyan on January 8, 2003. Appellants did not thereafter institute unlawful detainer proceedings against defendants because appellants never received notice or communication from anyone, or had any knowledge, that illegal activity continued at the premises. The first time appellants learned that the illegal activity had not ceased was when the City served them with the complaint in this action in July 2003.

On July 15, 2003, the trial court issued a temporary restraining order pending hearing on the injunction request. The court restrained appellants and defendants and their agents from owning, possessing, controlling, leasing, or operating a business which permits prostitution, a disorderly house, or a massage business without a valid permit.

### 3. *The preliminary injunction.*

In opposing the request for preliminary injunction, appellants argued that it was moot because, after the restraining order was issued, the illegal activity ceased and no longer posed a threat of harm. Declarations showed that Victoria's Health Care and the Weekly Press had vacated the premises the same day the restraining order was issued. Mavaddat changed the locks on the door and removed all signs. In September 2003, the district attorney and a police detective inspected the premises to verify that they were empty. Appellants asserted, "it is not now nor has it ever been the intent of Pacific, the owner of the subject property, [to] allow the subject premises to be used for any criminal and illegal activity."

The City replied that the issue was far from moot. The City's supporting evidence showed that signs advertising Victoria's Health Care and its "services" remained posted at the strip mall in September 2003. Although it appeared that the tenants had vacated, the status of the premises remained "in limbo." The original term of the lease did not expire for a year, after which the tenant had an option for five more years. Appellants had never provided the City with a lease termination. There had been no guarantees, evidence, or allegations that the property would not be leased to someone with ties to Spencer and Melikyan, or that appellants would disallow establishments like Victoria's Health Care or other such enterprises to operate at the premises. The City wanted relief to prevent appellants from allowing defendants or others like them from setting up an unlawful business at the property.

Following a hearing, the court issued the preliminary injunction on September 30, 2003. In so doing, the court stated that by "permitting their premises to be used as a house of prostitution for an extended period of time, [appellants] have shown that they are likely to continue to do so unless a preliminary injunction is issued by this court."

The preliminary injunction enjoins Pacific and Mavaddat and their agents from owning, leasing, maintaining, or managing Pacific's property in a manner that permits prostitution, or the performance of massage therapy thereon. The injunction orders appellants to cooperate with all law enforcement investigations and to comply with all laws and Los Angeles Municipal Code regulations. Appellants' notice of appeal was timely filed.

### CONTENTIONS

Appellants contend that (1) the trial court abused its discretion in issuing a preliminary injunction because, as the premises had been vacated, there is no

threat of future harm; and (2) as manager of a limited liability company, Mavaddat is immune from judgment. (Corp. Code, § 17158, subd. (a).)

## DISCUSSION

### I. *The Preliminary Injunction.**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### II. *The Liability of Limited Liability Company Managers.*

■ "Courts repeatedly construed the injunctive relief provided by the [Red Light Abatement Law] as in personam in nature. [Citations.]" (*People ex rel. Gwinn v. Kothari* (2000) 83 Cal.App.4th 759, 769 [100 Cal.Rptr.2d 29].) "[A] public nuisance abatement injunction is binding . . . on those whose actions are responsible for the nuisance; injunctions 'may work to deprive the enjoined parties of rights others enjoy precisely because the enjoined parties have abused those rights in the past.' [Citation.]" (*Id.* at p. 766.) A nuisance abatement injunction is effective also against anyone through whom the enjoined party may act. (*Ibid.*) Thus, Penal Code section 11226 provides, "Whenever there is reason to believe that a nuisance as defined in this article is kept, maintained, or is in existence . . . the district attorney . . . or the city attorney . . . may . . . maintain an action in equity to abate and prevent the nuisance and to perpetually enjoin the person conducting or maintaining it, *and the owner, lessee, or agent of the building* or place, in or upon which the nuisance exists, from directly or indirectly maintaining or permitting it." (Italics added.) Therefore, as manager and hence agent of the property's owner (Corp. Code, § 17157, subd. (b)(2)), Mavaddat may be enjoined from maintaining the nuisance thereon. (Pen. Code, § 11226.)

Mavaddat contends however, that as manager of a limited liability company, he is immune from personal liability for any judgment of a court against the company he manages. We disagree.

■ The Legislature enacted the Beverly-Killea Limited Liability Company Act (the Act) in 1994. (Corp. Code, § 17000 et seq.) " 'A limited liability company is a hybrid business entity formed under the Corporations Code . . . [which] provides members with limited liability to the same extent enjoyed by corporate shareholders [citation] . . . .' " (*PacLink Communications Internat., Inc. v. Superior Court* (2001) 90 Cal.App.4th 958, 963 [109 Cal.Rptr.2d 436]) while maintaining the attributes of a partnership for federal

---

*See footnote, *ante*, page 1203.

income tax purposes. (Assem. Com. on Rev. & Tax., Analysis of Sen. Bill. No. 469 (1993–1994 Reg. Sess.) as amended Aug. 9, 1994.)

■ The limited liability company " 'consist[s] of at least two "members" [citation] who own membership interests [citation]. The company has a legal existence separate from its members . . . but . . . the members . . . actively participate in the management and control of the company [citation]' [citation]" (*PacLink Communications Internat., Inc. v. Superior Court*, *supra*, 90 Cal.App.4th at p. 963), "[u]nless the articles of organization state that the management is vested in a manager or managers." (9 Witkin, Summary of Cal. Law (2004 supp.) Partnership, § 152, p. 338.)

■ The company's articles of organization may, but need not, provide that the business and affairs of the company are to be managed by one or more managers. (Corp. Code, § 17151, subd. (a).) The managers need not be members of the company. (*Ibid.*) "Every manager is an agent of the limited liability company for the purpose of its business or affairs . . . ." (Corp. Code, § 17157, subd. (b)(2).) ■ The manager owes the same fiduciary duties to the limited liability company and to its members as a partner owes to a partnership and to the partners of the partnership. (Corp. Code, § 17153.)

■ While generally *members* of a limited liability company are not personally liable for judgments, debts, obligations, or liabilities of the company "solely by reason of being a member" (Corp. Code, § 17101, subd. (a)), they are subject to liability under the same circumstances and to the same extent as corporate shareholders under common law principles governing alter ego liability and are *personally* liable under the same circumstances and extent as corporate shareholders. (§ 17101, subd. (b); 9 Witkin, Summary of Cal. Law, *supra*, Partnership, § 140, pp. 328–329.) Also, the Act "do[es] not relieve a member from liability arising from (1) the member's tortious conduct, or (2) the terms of a member's written guarantee or contractual obligation." (9 Witkin, *supra*, Partnership, § 140, p. 329, citing Corp. Code, § 17101, subd. (c).) By contrast, the Act does not contain a similar provision specifically exposing managers to personal liability.

Mavaddat focuses on Corporations Code section 17158, subdivision (a) to contend that the trial court erred in issuing the nuisance abatement injunction against him because that section exempts him from personal liability for any judgments against or obligations of the limited liability company he manages.

■ Corporations Code section 17158 reads, "No person who is a manager or officer or both a manager and officer of a limited liability company shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the limited liability company,

whether that liability or obligation arises in contract, tort, or otherwise, *solely by reason of being a manager* or officer or both a manager and officer of the limited liability company." (§ 17158, subd. (a), italics added.) A manager may agree to become personally responsible for the limited liability company's debts and liabilities by written contract, or if the operating agreement or articles so specify. (*Id.*, subd. (b).)

■ Although research has revealed no California case to address this issue, we hold that whereas managers of limited liability companies may not be held liable for the wrongful conduct of the companies *merely* because of the managers' status, they may nonetheless be held accountable under Corporations Code section 17158, subdivision (a) for their personal participation in tortious or criminal conduct, even when performing their duties as manager.

■ In interpreting a statute, we apply long-established principles: " 'The fundamental rule . . . is to ascertain the intent of the Legislature in order to effectuate the purpose of the law. . . . In doing so, we first look to the words of the statute and try to give effect to the usual, ordinary import of the language, at the same time not rendering any language mere surplusage. The words must be construed in context and in light of the nature and obvious purpose of the statute where they appear. . . . The statute " 'must be given a reasonable and commonsense interpretation consistent with the apparent purpose and intention of the Legislature, practical rather than technical in nature, and which, when applied, will result in wise policy rather than mischief or absurdity. . . .' " ' [Citations.]" (*Klajic v. Castaic Lake Water Agency* (2001) 90 Cal.App.4th 987, 997 [109 Cal.Rptr.2d 454]; see *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386–1387 [241 Cal.Rptr. 67, 743 P.2d 1323].)

The plain language of Corporations Code section 17158, subdivision (a), above quoted, expresses a circumscribed protection from liability. The phrase declaring managers exempt from liability is qualified by the phrase "solely by reason of being a manager . . . ." Reading the language of section 17158, subdivision (a) as a whole, it is clear that managers were not intended to be held liable for the wrongs their companies commit simply because of their status as managers. The qualifying clause, however, does not preclude personal liability for a manager's own conduct. At least one commentator appears to agree that managers may be held liable for their personal wrongful conduct. (Forming & Operating California Limited Liability Companies (Cont.Ed.Bar 2005) § 6.28, pp. 212–213.)

■ Our construction is consistent with Corporations Code section 17155. Section 17155 allows a limited liability company to provide for

indemnification for its managers against judgments, settlements, penalties, fines, or expenses, "incurred as a result of acting in that capacity" (§ 17155, subd. (a)), and to purchase and maintain insurance for its managers against liability asserted against or incurred by the manager "in that capacity or arising out of the person's status as a manager." (§ 17155, subd. (b).) If, as Mavaddat contends, section 17158, subdivision (a) cloaked him in absolute immunity, then there would be no need for indemnification or insurance, and no need for section 17155 to exist. Our construction of section 17158, subdivision (a) is compatible with the Act's statutory scheme as a whole.

We disagree with Mavaddat that Corporations Code section 17158, subdivision (a) grants "absolute immunity" to him as manager "with respect to any defalcations" of the business he manages for whatever reason. Such a reading is overbroad. Had the Legislature intended such unconditional immunity, it could easily have written the statute that way. We decline to redraft the statute to grant absolute immunity where the Legislature has conspicuously omitted to do so. (*City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 88 [260 Cal.Rptr. 520, 776 P.2d 222].)

Although the statute is clear on its face, we find support for our conclusion in other statutes and principles. Managers of limited liability companies may be held responsible under Penal Code section 387. Section 387[4] shields managers of limited liability companies from liability "solely by reason of being a manager," but then makes those managers guilty of a public offense for conduct in which they have "management authority" and "significant responsibility . . . that includes actual authority" for the wrongful conduct. (§ 387, subds. (b)(1) & (d).) Given that the Legislature exposed limited liability company managers to liability under section 387 for their responsibility or actual authority for a public offense, it is reasonable to conclude that managers would not be shielded from personal liability by Corporations Code section 17158, subdivision (a) when they have actual authority over, or significant responsibility for, the wrong.

---

[4] Penal Code section 387, subdivision (a) provides that a limited liability company, "or person who is a manager with respect to a product, facility, equipment, process, place of employment, or business practice, is guilty of a public offense . . ." if that company or manager has "actual knowledge of a serious concealed danger" that is subject to regulation, and fails immediately, to inform the regulatory authorities and warn affected employees. (§ 387, subd. (a)(1).) Subdivision (d) then states: "No person who is a manager of a limited liability company shall be personally liable for acts or omissions for which the limited liability company is liable under subdivision (a) *solely by reason of being a manager* of a limited liability company. A person who is a manager of a limited liability company may be held liable under subdivision (a) if that person is also a 'manager' within the meaning of paragraph (1) of subdivision (b)." (Italics added.) Such a manager is one who has "management authority" and "[s]ignificant responsibility . . . that includes actual authority" for the safety of the product, practice or research. (Pen. Code, § 387, subd. (b)(1)(A) & (1)(B).)

A similar conclusion was reached by the Iowa Supreme Court based on a comparable statutory scheme for limited liability companies. In Iowa, "[e]xcept as otherwise provided in this chapter or by written agreement of a member, a member or manager of a limited liability company is not personally liable *solely by reason of being a member or manager* of the limited liability company under any judgment, or in any other manner, for any debt, obligation, or liability of the limited liability company, whether that liability or obligation arises in contract, tort, or otherwise." (Iowa Code Ann. § 490A.603, subd. (1), italics added.) In *Estate of Countryman v. Farmers Co-op. Assn.* (Iowa 2004) 679 N.W.2d 598, the Iowa Supreme Court rejected the argument that the manager of a limited liability company was protected from liability for damages caused by an explosion of propane gas the company had delivered to the decedents' home. The Iowa Supreme Court stated, "this approach is contrary to the corporate model and agency principles upon which the liability of LLC members and managers is based, and cannot be found in the language of the statute. We acknowledge that the 'participation in tortious conduct' standard would not impose tort liability on a manager for merely performing a general administrative duty. [Citations.] There must be some participation. [Citation.] The participation standard is consistent with the principle that members or managers are not liable based only on their status as members or managers. [Citation.] Instead, liability is derived from individual activities. Yet, a manager who takes part in the commission of a tort is liable even when the manager acts on behalf of a corporation. [Citations.] The [Iowa limited liability company act] does not insulate a manager from liability for participation in tortious conduct merely because the conduct occurs within the scope and role as a manager." (*Id.* at p. 604, citing 3A Berger et al., Fletcher Cyclopedia of the Law of Private Corporations (perm. ed. 2002) §§ 1135, 1137, pp. 200–219.)

██ We agree with this reasoning. In California, Corporations Code section 17158, subdivision (a) does not preclude holding managers liable for their participation in wrongful conduct when acting on behalf of the company.

By way of analogy (*PacLink Communications Internat., Inc. v. Superior Court, supra,* 90 Cal.App.4th at p. 963 [Act incorporates many provisions of the Corporations Code]), it has long been the law elsewhere, that although officers cannot be held liable solely by virtue of their corporate title, they can and are held personally liable for actively participating in criminal and tortious conduct. (See *United States v. Park* (1975) 421 U.S. 658, 674 [44 L.Ed.2d 489, 95 S.Ct. 1903] [jury properly instructed that the defendant's guilt cannot be "solely on the basis of [his] position in the corporation;" but properly when the defendant " 'had a responsible relation to the situation,' and 'by virtue of his position . . . had . . . authority and responsibility' to deal with the situation"].) In California, "[d]irectors or officers of a corporation do

not incur personal liability for torts of the corporation merely by reason of their official position, unless they participate in the wrong or authorize or direct that it be done." (*United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 595 [83 Cal.Rptr. 418, 463 P.2d 770]; see 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 34–35, pp. 94–95; Corp. Code, § 204, subd. (a)(10).) Corporate officers in California can be held criminally answerable for the acts of corporations in which they are " '*personally a participant* . . . .' [Citations.]" (*Sea Horse Ranch, Inc. v. Superior Court* (1994) 24 Cal.App.4th 446, 457 [30 Cal.Rptr.2d 681], italics added, citing *Otis v. Superior Court* (1905) 148 Cal. 129, 131 [82 P. 853] & *People v. International Steel Corp.* (1951) 102 Cal.App.2d Supp. 935, 942–943 [226 P.2d 587]; see *People v. Conway* (1974) 42 Cal.App.3d 875, 884–886 [117 Cal.Rptr. 251] [president "was in a position to *control* the activities of the [corporation] and thus could be held criminally liable for false advertising"].)

It is fair to assume that the Legislature was aware of the prior cases concerning corporate officer and director liability when it enacted section 17158, subdivision (a) in the Corporations Code, and intended to codify existing case law when it utilized similar language in section 17158, subdivision (a) to describe the liability of limited liability company managers. (*City of Santa Cruz v. Municipal Court, supra,* 49 Cal.3d at p. 88.) Certainly, there is no indication that the Legislature intended to confer more protections for managers of limited liability companies than for corporate officers and directors. Therefore, consistent with analogous principles of corporate law and based on the words of the statute itself, we hold that managers may not be held liable for tortious or criminal wrongs committed by the company merely because of their status as managers, but may be personally liable for their participation in those wrongs.

■ Turning to Mavaddat, the preliminary injunction was not imposed on him solely because of his *status* as manager of Pacific, but because of his personal involvement in allowing the nuisance to persist. By his own admission, Mavaddat occupied a prominent and influential position at Pacific. Mavaddat declared he had extensive knowledge and control over Pacific's affairs, is "thoroughly familiar with all of its operations and business . . . ." He selected and authorized counsel to appear at the meeting with the City's attorney. Mavaddat had full responsibility for and authority over the property where the nuisance occurred. He leased the premises to Melikyan, and his name appears on the lease as the agent of Pacific. He retained the right under the lease to inspect the premises to determine its compliance with the lease and all laws and ordinances. It was Mavaddat who served the notice to perform covenant and yet failed thereafter to inspect the premises to ascertain whether defendants had complied with the notice. Mavaddat served the notice to quit, arranged to have the locks changed and signs removed after defendants moved out, and intended to arrange for another tenant to lease the

premises. Yet the sign for Victoria's Health Care remained on the strip mall's main pylon sign in September 2003. Mavaddat had the knowledge and the responsibility to prevent the nuisance. He is not insulated from liability by virtue of Corporations Code section 17158, subdivision (a) for his personal involvement in aiding and abetting the nuisance and for failing to abate it, which thereby forced the City to bring this Red Light Abatement action. The preliminary injunction was properly issued against Mavaddat.

## DISPOSITION

The order is affirmed.

Klein, P. J., and Croskey, J., concurred.