Filed 3/17/26  Justus Wallace Peppertree Park etc. v. Peppertree Village-VII CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JUSTUS WALLACE PEPPERTREE PARK VILLAGES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> PEPPERTREE VILLAGE-VII, LLC et al., <br><br> Defendants and Appellants. | D084353 <br><br><br> (Super. Ct. No. 37-2014-00040032-CU-BC-NC) |

APPEAL from a judgment of the Superior Court of San Diego County, Earl J. Maas, III, Judge.  Affirmed as modified.

Law Offices of Mary A. Lehman and Mary A. Lehman for Defendants and Appellants.

Finlayson Toffer Roosevelt & Lilly, Jesse S. Finlayson and Kayla Y. Wales for Plaintiff and Respondent.

I

INTRODUCTION

Peppertree Village-VII, LLC (Peppertree Village 7) sold two parcels of land to a buyer that planned to develop the land into a residential housing

community. When escrow closed, Peppertree Village 7 refused to cooperate with the buyer to satisfy certain government-mandated conditions necessary for the buyer to develop the land as intended. Therefore, the buyer sued Peppertree Village 7 and several related parties, including Northern Capital Inc., LLC (Northern Capital), which served as the managing member of Peppertree Village 7, and Duane Urquhart, who served as the managing member of Northern Capital. After a bench trial, the trial court found the defendants liable for breach of contract, breach of the covenant of good faith and fair dealing, intentional interference with contractual relations, and promissory estoppel, and awarded the buyer $4,610,911.40 in compensatory damages. The buyer then assigned its interests in the lawsuit to Justus Wallace Peppertree Park Villages (Justus Wallace), which substituted into the case as the plaintiff.

Peppertree Village 7, Northern Capital, and Urquhart appeal the judgment against them. They argue the trial court erred in finding Northern Capital and Urquhart jointly and severally liable for the damages award based solely on their status as the managing members of the limited liability company (LLC) defendants. They also argue that substantial evidence does not support a significant portion of the damages award (a portion totaling $3,284,749) compensating Meritage for its claimed lost profits during the three-year delay in development caused by the defendants' breach of contract.

We agree with the defendants that substantial evidence does not support the portion of the damages award related to development delays. We also agree with the defendants that the court erred by finding Northern Capital jointly and severally liable for the damages award. However, we conclude the court properly found Urquhart jointly and severally liable based on his participation in the conduct giving rise to the defendants' liability.

2

Therefore, we modify the judgment to reduce the compensatory damages award from $4,610,911.40 to $1,326,162.40, and to state that only Peppertree Village 7 and Urquhart (not Northern Capital) are jointly and severally liable for the damages award.  The judgment is affirmed as modified.

## II

## BACKGROUND

A. *Factual Background*

This lawsuit arises out of the sale of land in Fallbrook and the parties' efforts to develop the land into a master-planned community called Peppertree Park.  The Peppertree Park development consists of ten multi-acre parcels, also known as units, which collectively span 162.9 acres.

In 1991, the County of San Diego approved a tentative map for Peppertree Park.  Units 1 through 6 were developed according to the 1991 tentative map.  Thereafter, the County adopted a revised tentative map governing the development of units 7 through 10.  The revised tentative map included conditions of approval, which were prerequisites to the development of units 7 through 10.  One of the conditions required the owners of units 7 through 10 to dedicate to the County an easement to an open space area of protected wetland located between units 7 and 8, on one side, and units 9 and 10, on the other side.

As of 2013, Peppertree Village 7 owned units 7 and 8, and a related company, Peppertree Park Villages 9 & 10, LLC (Peppertree Park 9 & 10), owned units 9 and 10.  Northern Capital was the managing member of both companies and Peppertree Land Company, a general partnership, was the sole investor member of both companies.  Urquhart served as the president and managing member of Northern Capital, and as the managing general partner of Peppertree Land Company.

3

In September 2013, Peppertree Park 7 sold units 7 and 8 to Meritage Homes of California (Meritage) for $5.9 million pursuant to a purchase and sale agreement. Meritage intended to build residential housing on the land, which it could only do if the parties cooperated to satisfy the County's conditions of approval.[1]

However, after the close of escrow, Urquhart refused to dedicate the portion of units 9 and 10 necessary for the open space easement, unless Meritage satisfied certain demands. In particular, he demanded that Meritage engineer a "balanced" grading plan for unit 7 (a plan where no soil would be imported into the unit or exported from it), and that it export 90,000 cubic yards of soil from the open space of protected wetland—conditions Meritage was unable or unwilling to accept.[2]

B. *Procedural History*

The parties were unable to resolve their differences concerning the dedication of the easement to the County. Therefore, Meritage commenced the present lawsuit. In the operative complaint, Meritage asserted causes of action for negligent and intentional misrepresentation against Urquhart, in his individual capacity and as an agent of Peppertree Park 7, Peppertree Village 9 & 10, and Northern Capital; breach of contract and breach of the covenant of good faith and fair dealing against Peppertree Park 7 and Peppertree Village 9 & 10; and intentional interference with contractual relations and promissory estoppel against Urquhart and Peppertree Village 9 & 10. Meritage also sought to hold Urquhart personally

---

[1]    The conditions of approval were incorporated by reference into the purchase and sale agreement.

[2]    Peppertree Park 7 dissolved itself and transferred its assets to Peppertree Village 9 & 10 approximately six months after the close of escrow.

liable for the companies' conduct under an alter ego theory of liability. Broadly speaking, the operative complaint alleged the defendants breached the purchase and sale agreement and frustrated Meritage's ability to benefit from the agreement by failing to cooperate with Meritage to satisfy the County's conditions of approval. Meritage prayed for damages according to proof, prejudgment interest, attorney's fees and costs, and rescission of the purchase and sale agreement based on theories of mistake of fact and failure of consideration.

Peppertree Park 7, Peppertree Village 9 & 10, Northern Capital, and Urquhart cross-complained against Meritage for indemnity, declaratory relief, and breach of the covenant of good faith and fair dealing. The cross-complaint rested primarily on allegations that Meritage did not perform adequate due diligence before the land sale and failed to cooperate with the cross-complainants after the close of escrow.

The parties stipulated to a bifurcated bench trial with the first phase focusing on their substantive causes of action and the second phase addressing Meritage's alter ego allegations. At the end of the first phase of the trial, the court issued an initial statement of decision in favor of Meritage on its causes of action for breach of contract, breach of the covenant of good faith and fair dealing, intentional interference with contractual relations, and promissory estoppel, and denied recovery on all remaining causes of action and the cross-complaint. The court found Peppertree Park 7 breached the purchase and sale agreement, and the covenant of good faith and fair dealing, by refusing to cooperate with Meritage to dedicate the open space easement and/or comply with the County's conditions of approval. For these causes of action, the court found Peppertree Village 7 and its successor-in-interest, Peppertree Park 9 & 10, jointly and severally liable. With respect to the

intentional interference and promissory estoppel causes of action, the court found Urquhart acted in his individual capacity and as an agent of Peppertree Village 9 & 10 when he interfered with the purchase and sale agreement, and when he falsely promised Meritage that the defendants would cooperate to dedicate the open space easement.

The court awarded Meritage compensatory damages totaling $4,610,911.49, and prejudgment interest. The compensatory damages included $241,776.89 for "property taxes" incurred by Meritage, $429,182.68 for "site development costs" (e.g., engineering consultant costs), $185,202.92 for "other engineering and development-related costs" (e.g., a grading deposit with the County, erosion control maintenance costs, model furniture costs, and park impact fees), $470,000 for "costs associated with re-entitling the Project," and $3,284,749 for the three-year development delay caused by the defendants' breach. The court determined the cost of the delay ($3,284,749) by taking the original purchase price of units 7 and 8 ($5,900,000) and deducting the purported value of the land assuming it was subject to a three-year development delay ($2,615,251).

All parties objected to the initial statement of decision and responded to the other side's objections. Thereafter, the court issued its final statement of decision. The final statement of decision was identical to the initial statement of decision, except it found Northern Capital and Peppertree Land Company jointly and severally liable for the damages awarded for breach of contract and breach of the covenant of good faith and fair dealing. Consistent with the final statement of decision, the court entered a judgment finding Peppertree Park 7, Peppertree Village 9 & 10, Peppertree Land Company, Northern Capital, and Urquhart jointly and severally liable to Meritage in the amount of $4,610,911.40, plus prejudgment interest.

6

The defendants filed postjudgment motions for a new trial and to vacate the judgment, which the court denied.[3] The defendants then appealed the judgment. In an unpublished opinion, we dismissed the appeals. (*Meritage Homes of California, Inc. v. Peppertree Village-VII, LLC* (Dec. 20, 2019, D073088) [nonpub. opn.].) We reasoned the judgment was not final and appealable because the bifurcated bench trial on Meritage's alter ego claims had not yet taken place. (*Ibid.*)

After we issued our remittitur, Meritage assigned its rights in the case to Justus Wallace, which substituted into the case as the plaintiff for Meritage. Justus Wallace then dismissed Peppertree Park 9 & 10 and Peppertree Land Company from the litigation, abandoned its alter ego claims, and requested entry of an amended judgment.

The trial court granted the request and entered an amended final judgment finding the remaining defendants—Peppertree Park 7, Northern Capital, and Urquhart—jointly and severally liable to Justus Wallace in the amount of $4,610,911.40, plus prejudgment and postjudgment interest. Peppertree Park 7, Northern Capital, and Urquhart timely appealed the judgment in favor of Justus Wallace.

III

DISCUSSION

The defendants present two claims of error on appeal. First, they contend the trial court erroneously found Urquhart and Northern Capital jointly and severally liable for the damages award based solely on their roles

---

[3] After the defendants filed their postjudgment motions, Urquhart, Northern Capital, and Peppertree Village 9 & 10 each filed bankruptcy petitions resulting in an automatic stay of the current lawsuit. However, the bankruptcy court modified the automatic stay to permit the defendants to obtain a ruling on their postjudgment motions and appeal the judgment.

7

as the managing members of the LLC defendants.  Second, they argue the damages awarded as compensation for Meritage's inability to develop the land into housing for three years ($3,284,749) was improper for several reasons.  We address these claims in turn.

A. *The Trial Court Properly Found Urquhart Jointly and Severally Liable, but Erred in Finding Northern Capital Jointly and Severally Liable*

1. *Legal Principles*

Peppertree Park 7, Peppertree Village 9 & 10, and Northern Capital are (or were) LLCs.  An LLC " ' "is a hybrid business entity formed under the Corporations Code ... [which] provides members with limited liability to the same extent enjoyed by corporate shareholders [citation] ...." ' [citation] while maintaining the attributes of a partnership for federal income tax purposes. [Citation.] [¶] The limited liability company ' "consist[s] of at least two 'members' [citation] who own membership interests [citation].  The company has a legal existence separate from its members ... but ... the members ... actively participate in the management and control of the company [citation]" [citation]' [citation], '[u]nless the articles of organization state that the management is vested in a manager or managers.' " (*People v. Pacific Landmark, LLC* (2005) 129 Cal.App.4th 1203, 1211–1212 (*Pacific Landmark*).)  In general, a member of an LLC is not responsible for the debts, obligations, or other liabilities of the LLC "solely by reason of the member acting as a member" of the LLC.  (Corp. Code, § 17703.04, subd. (a)(2).)[4]

However, this limitation on liability is not absolute, and a member of an LLC may be held liable for the member's "participation in tortious conduct."  (§ 17703.04, subd. (c).)  A member may also be held liable

---

[4]    Further undesignated statutory references are to the Corporations Code.

8

"pursuant to the terms of a written guarantee or other contractual obligation entered into by the member." (*Ibid.*) Further, a member may be held liable for the debt, obligation, or liability of an LLC "under the same or similar circumstances and to the same extent as a shareholder of a corporation may be personally liable for any debt, obligation, or liability of the corporation." (*Id.*, subd. (b).) "Shareholders of a corporation are not normally liable for its torts, but personal liability may attach to them ... when the shareholder specifically directed or authorized the wrongful acts."[5] (*Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773, 785; see also *Holistic Supplements, LLC v. Stark* (2021) 61 Cal.App.5th 530, 544 ["As the director and shareholder of the corporation, [the defendant] could be held personally liable for participating in, directing, or authorizing tortious conduct."].)

2. *Urquhart*

The defendants contend the trial court erroneously imposed liability on Urquhart based solely on his status as Northern Capital's managing member, in violation of the general shield on liability set forth in section 17703.04, subdivision (a)(2). In response, Justus Wallace argues the court did not impose liability on Urquhart based on his role as managing member; instead, it found him liable because he personally committed the tortious conduct giving rise to the intentional interference with contractual relations and promissory estoppel causes of action. We agree with Justus Wallace.

From the final statement of decision, it is apparent the trial court found Urquhart liable for the damages award based on his personal conduct and not based solely on his status as Northern Capital's managing member. The

---

[5] Personal liability can also attach to a member of an LLC under an alter ego theory of liability. (§ 17703.04, subd. (b).) As noted, Justus Wallace waived and abandoned its alter ego claims against the defendants.

court found, "Mr. Urquhart ... acting individually ... has continually and unreasonably interfered with the contract between Meritage and Peppertree Village [7] ... as he has repeatedly insisted that Meritage engineer a 'balanced' Unit 7 grading plan (an engineering impossibility) and impeded Meritage's reasonable efforts to dedicate the Open Space Easement to the County (through bifurcation or otherwise) on the purported basis that 90,000 cubic yards of soil must be exported from the Open Space to Unit 8." The court also found, "Mr. Urquhart, in his individual capacity ... promised Meritage that Defendants would cooperate with Meritage and perform any action necessary and reasonably appropriate to permit Meritage to promptly proceed with development of Units 7 and 8," a promise on which Meritage reasonably relied to its detriment.

Substantial evidence supports these factual findings. Indeed, there was ample evidence that Urquhart executed the purchase and sale agreement on behalf of Northern Capital, engaged in discussions with representatives from Meritage about the sale of units 7 and 8, made promises to representatives from Meritage that the defendants would cooperate to dedicate the open space easement, and ultimately refused to cooperate unless Meritage satisfied his unjustified demands concerning a "balanced" grading plan for unit 7 and the exportation of soil from the open space.[6] On this record, the court properly found Urquhart liable for his own participation in the tortious conduct under section 17703.04, subdivisions (b) and (c).

Nonetheless, the defendants claim Urquhart was shielded from liability because he was merely executing his duties as the managing member of Northern Capital—not acting in his individual capacity—when he interacted

---

[6] In their appellate brief, the defendants concede Meritage "necessarily dealt with Urquhart" during its communications with the defendants.

10

with Meritage.  We are not persuaded.  By its plain terms, section 17703.04 states, without qualification, that its limitation on member liability does not "affect the liability of a member of a limited liability company to third parties for the member's participation in tortious conduct."  (§ 17703.04, subd. (c).) The statute contains no exception precluding or limiting liability when a member purports to engage in tortious conduct on behalf of the member's LLC.  It is not our role to write such an exception into the statute where none appears.  (Code Civ. Proc., § 1858 [our role in interpreting the statute is "not to insert what has been omitted, or to omit what has been inserted"]; *Stirling v. Brown* (2018) 18 Cal.App.5th 1144, 1156 [" ' "It is ... against all settled rules of statutory construction that courts should write into a statute by implication express requirements which the Legislature itself has not seen fit to place in the statute." ' "].)

The case law also undercuts the defendants' claim.  For example, in *Pacific Landmark*, the government filed a red-light abatement action to halt the operation of an illegal massage parlor that was being used for purposes of prostitution.  (*Pacific Landmark, supra*, 129 Cal.App.4th at p. 1207.)  The trial court enjoined the owner of the property, Pacific Landmark, LLC, as well as the company's manager, from owning or leasing the property in a manner that permitted prostitution.  (*Id.* at p. 1210.)  On appeal, the manager argued that former section 17158—a predecessor to section 17703.04—shielded him from liability for wrongful acts undertaken on behalf

of the company.[7] (*Pacific Landmark,* at p. 1212.)  The *Pacific Landmark* court disagreed.  As the court observed, the statute did "not preclude personal liability for a manager's own conduct," including conduct undertaken on behalf of the company.  (*Id.* at p. 1213.)  Instead, it permitted a manager of an LLC to "be held accountable ... for their personal participation in tortious or criminal conduct, *even when performing their duties as manager.*"  (*Ibid.,* italics added; see also *id.* at p. 1215 ["[S]ection 17158, subdivision (a) does not preclude holding managers liable for their participation in wrongful conduct *when acting on behalf of the company.*"], italics added.)

The *Pacific Landmark* decision is consistent with the limitations on personal liability that apply to directors and officers of corporations.  Within that analogous context, the Supreme Court has held, "Directors or officers of a corporation ... may be liable, under the rules of tort and agency, for tortious acts *committed on behalf of the corporation.*"  (*United States Liability Ins. Co. v. Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 595, italics added; see also *Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 504 ["Directors are liable to third persons injured by their own tortious conduct *regardless of whether they acted on behalf of the corporation*"], italics added.)  These holdings are directly applicable here, given that section 17703.04 states that a member of an LLC "shall ... be personally liable under a judgment of a court or for any debt, obligation, or liability of the limited liability company ... under the same or similar circumstances and to the same

---

7  Former section 17158 stated, in relevant part, "No person who is a manager or officer or both a manager and officer of a limited liability company shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the limited liability company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a manager or officer or both a manager and officer of the limited liability company."  (§ 17158, subd. (a).)

12

extent as a shareholder of a corporation may be personally liable for any debt, obligation, or liability of the corporation." (§ 17703.04, subd. (b).)

For all these reasons, we reject the defendants' claim of error and instead conclude the court properly found Urquhart liable for the damages award in favor of Meritage based on his participation in the conduct giving rise to the defendants' liability.[8] (§ 17703.04, subds. (b), (c).)

3. *Northern Capital*

The defendants also claim the trial court erroneously found Northern Capital liable for the damages award based on its status as the managing member of Peppertree Park 7 and Peppertree Village 9 & 10. By contrast, Justus Wallace argues that the court properly found Northern Capital liable based on a provision contained within the purchase and sale agreement.

Notwithstanding the general shield on LLC member liability, liability can attach to a member, as noted, "pursuant to the terms of a written guarantee or other contractual obligation entered into by the member." (§ 17703.04, subd. (c).) Justus Wallace argues Northern Capital accepted such an obligation when it executed the purchase and sale agreement on behalf of Peppertree Village 7. According to Justus Wallace, Paragraph 14.9

---

[8] The defendants assert for the first time in their reply brief that the trial court erred by finding Urquhart jointly and severally liable because: (1) a provision in the purchase and sale agreement purportedly limits Urquhart's personal liability; (2) the conduct giving rise to the promissory estoppel cause of action was not tortious; and (3) Urquhart could not have interfered with the contractual relationship between Meritage and Peppertree Village 7 because he was not a stranger to the contract. The defendants forfeited these arguments by failing to raise them in their opening brief. (See *Aptos Council v. County of Santa Cruz* (2017) 10 Cal.App.5th 266, 296, fn. 7 ["Issues not raised in the appellant's opening brief are deemed waived or abandoned."]; *Crawley v. Alameda County Waste Management Authority* (2015) 243 Cal.App.4th 396, 403, fn. 4 ["We do not address arguments [a party] raises for the first time in his reply brief."].)

of the purchase and sale agreement enabled the court to find Northern Capital liable for any breach of the agreement by Peppertree Village 7.

"Absent any conflict in extrinsic evidence, we review de novo issues regarding the proper interpretation of a contract. [Citations.] [¶] The fundamental goal of contract interpretation is to give effect to the mutual intention of the parties as it existed at the time they entered into the contract. [Citations.] That intent is interpreted according to objective, rather than subjective, criteria. [Citations.] When the contract is clear and explicit, the parties' intent is determined solely by reference to the language of the agreement. [Citations.] The words are to be understood 'in their ordinary and popular sense' [citation]; and the 'whole of [the] contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.' " (*Gilkyson v. Disney Enterprises, Inc.* (2021) 66 Cal.App.5th 900, 915–916.)

As stated, Justus Wallace argues that Paragraph 14.9 of the purchase and sale agreement allowed the court to impose liability on Northern Capital. Paragraph 14.9 provides, "Multiple Parties.  In the event Seller consists of more than one person and/or entity and Seller defaults or is in breach of any of the terms of this Agreement, all of the persons and entities comprising Seller shall be jointly and severally liable for the performance and/or satisfaction of Seller's obligations under this Agreement."  The purchase and sale agreement defines the term, "Seller," as Peppertree Village 7.

Exercising our de novo review, we conclude Paragraph 14.9 of the purchase and sale agreement is not a commitment to make Northern Capital liable for any breach of the agreement by Peppertree Village 7.  Rather, as evidenced by the heading ("Multiple Parties"), Paragraph 14.9 is a standard contractual provision that was intended to apply if the defined contractual

14

term "Seller" had included more than one party—i.e., if more than one seller had been involved in the land sale contemplated by the purchase and sale agreement. The manifest purpose of Paragraph 14.9 was for the contracting parties to select the degree of obligation applicable to any co-obligers if multiple sellers had been involved in the land sale and one (or more) of the sellers had breached the agreement. Through Paragraph 14.9, the contracting parties decided that any such co-obligers would have been subject to joint and several liability, as opposed to joint liability or several liability.[9]

In resisting this commonsense interpretation of Paragraph 14.9, Justus Wallace notes that Paragraph 14.9 applies when the "Seller" (a term defined as Peppertree Village 7) "consists of more than one person and/or entity," and it imposes joint and several liability on "the persons and entities comprising Seller." According to Justus Wallace, Peppertree Village 7 "consists of" more than one entity because it has one managing member (Northern Capital) and one investor member (Peppertree Land Company); thus, Paragraph 14.9 imposes joint and several liability on both entities.

This strained construction of Paragraph 14.9 does not reflect the mutual intention of the contracting parties when they entered into the

_____

[9] "Except when a statute provides otherwise ... two or more parties to a contract may bind themselves jointly, severally, or jointly and severally. ... Copromisors are liable jointly if all of them have promised the entire performance of the contract. The effect of a joint obligation is that each joint promisor is liable for the whole performance jointly assumed. ... A several obligation, by contrast, has the effect of creating two separate liabilities on a single contract. Thus, when a several obligation is entered into by two or more parties in one instrument, it is the same as though each has executed separate instruments. ... Finally, a joint and several contract is a contract made by the promisee with each promisor and a joint contract made with all the promisors, so that parties having a joint and several obligation are bound jointly as one party, and also severally as separate parties at the same time." (12 Williston on Contracts (4th ed. 2025) § 36:1, fns. omitted.)

purchase and sale agreement. Paragraph 14.9 does not include the terms "member" or "managing member." It does not identify either member of Peppertree Village 7 by name. It also does not reference, let alone express an intention to override, the general limitation on member liability set forth in section 17703.04, subdivision (a)(2). Had the contracting parties intended to override the general statutory limitation on member liability and hold Northern Capital liable for any breach of the purchase and sale agreement by Peppertree Village 7, the parties surely would have effectuated this intention using more explicit language than the boilerplate language of Paragraph 14.9. "We do not have the power to create for the parties a contract that they did not make and cannot insert language that one party now wishes were there." (*Vons Cos. v. United States Fire Ins. Co.* (2000) 78 Cal.App.4th 52, 59; see also *Holguin v. Dish Network LLC* (2014) 229 Cal.App.4th 1310, 1323–1324 [" 'Our function is to determine what, in terms and substance, is contained in the contract, not to insert what has been omitted.' "].)

Apart from its invocation of Paragraph 14.9 of the purchase and sale agreement, Justus Wallace offers no defense to the trial court's determination that Northern Capital was jointly and severally liable for the damages award. Because we reject Justus Wallace's proposed interpretation of Paragraph 14.9, and we are aware of no other basis to affirm the trial court's ruling, we must conclude the court erroneously held Northern Capital liable for the damages award based solely on its status as the managing member of Peppertree Village 7, in violation of section 17703.04, subdivision (a)(2).

B. *Substantial Evidence Does Not Support the Award of $3,284,749 in Damages for Development Delays Caused by the Breach of Contract*

The trial court issued a compensatory damages award to Meritage (and later Justus Wallace) in the amount of $4,610,911.49, plus prejudgment and postjudgment interest. Most of those damages ($3,284,749) were awarded to

16

compensate Meritage for its inability to build and sell residential housing on the land for three years due to the defendants' breach of the purchase and sale agreement. The defendants challenge the portion of the award related to these delays on numerous grounds. Relevant here, they contend substantial evidence does not support these delay-related damages. We agree with the defendants.[10]

1. *Additional Background*

Meritage relied on the testimony of a single lay witness, Johanna Yee, to substantiate its claim for $3,284,749 in development delay-related damages. At the time of trial, Yee served as Meritage's Director of Finance. In that role, she was responsible for the company's daily operations, financial reporting, budgeting, forecasting, and the preparation of pro forma analyses for the company's land acquisitions.[11]

Most of Yee's testimony concerned the out-of-pocket costs Meritage incurred in connection with the Peppertree Park development—not the claimed damages Meritage allegedly suffered due to its inability to develop the property in a timely manner. On the topic of Meritage's out-of-pocket expenses, Yee testified that Meritage incurred a variety of expenses including property taxes; site development costs (e.g., engineering consultant costs); other engineering and development-related costs (e.g., a grading deposit,

_____

[10]    Because we conclude substantial evidence does not support the portion of the damages award related to development delays, we do not address the defendants' claim that a new trial was warranted because Meritage surprised the defendants with its theory of damages at trial (Code Civ. Proc., § 657(3)), or their claim that Meritage was awarded duplicative damages.

[11]    "Pro forma balance sheets and income statements are financial projections based on expected revenues and costs." (*Shreiber v. City of Los Angeles* (2021) 69 Cal.App.5th 549, 553, fn. 2.)

erosion control maintenance costs, model furniture costs, and park impact fees); and project re-entitlement costs. Meritage also introduced into evidence a voluminous compilation of its expenses and invoices to substantiate Yee's testimony, as well as a summary of those costs prepared by Yee. Based largely on this evidence, the court awarded Meritage $241,776.89 for "property taxes," $429,182.68 for "site development costs," $185,202.92 for "other engineering and development-related costs," and $470,000 for "costs associated with re-entitling the Project." The defendants do not challenge these damages on appeal.

In addition, Yee briefly testified about Meritage's damages flowing from its inability to develop and sell the land to homebuyers for an additional three years due to the defendants' breach. She explained that Meritage had prepared a pro forma for the Peppertree Park development when it initially bought units 7 and 8 for $5.9 million. Yee testified that the pro forma projected Meritage would realize a positive net margin of 14.7 percent from the project, factoring in various assumptions concerning the predicted costs of the forthcoming project and its expected development timelines.

Yee also testified that the delay in Meritage's development timeline caused by the defendants' breach of contract "obviously affect[ed] [the company's] pro forma in a negative fashion." She stated that she ran a revised analysis using the pro forma and concluded the company's profit margin would have been negative 6.2 percent if, at the outset of the project, it had extended its development timeline by three years and kept all other assumptions the same. According to Yee, Meritage could only have achieved its initial projected net margin of 14.7 percent with a three-year development delay if it had paid $2.6 million for the land—i.e., $3.3 million less than it actually paid for the land. Based solely on this testimony, the court awarded

18

Meritage $3,284,749 for the delay caused by the defendants' breach of the purchase and sale agreement.[12]

2. *Legal Principles*

The portion of the damages award at issue was, in effect, granted to compensate Meritage for the lost profits it would have realized if the defendants had not breached the purchase and sale agreement, thereby delaying Meritage's ability to construct residential housing on the land—i.e., to compensate Meritage for the benefit of its contractual bargain.

" 'Contract damages compensate a plaintiff for its lost expectation interest.  This is described as the benefit of the bargain that full performance would have brought.' " (*Moore v. Centrelake Medical Group, Inc.* (2022) 83 Cal.App.5th 515, 531 (*Moore*); *Coughlin v. Blair* (1953) 41 Cal.2d 587, 603 ["Damages are awarded in an action for breach of contract to give the injured party the benefit of his bargain and insofar as possible to place him in the same position he would have been in had the promisor performed the contract."].)

" 'Contractual damages are of two types—general damages (sometimes called direct damages) and special damages (sometimes called consequential damages).' [Citation.]  'General damages are often characterized as those that flow directly and necessarily from a breach of contract, or that are a natural result of a breach.' [Citation.]  General damages ' "are based on the value of the performance itself, not on the value of some consequence that

---

12    During Yee's direct examination, Meritage's trial counsel referenced and showed the witness a trial exhibit (exhibit 197) that appears to be an updated pro forma for the Peppertree Park project factoring in a three-year delay in development.  However, the demonstrative exhibit was never admitted into evidence and the trial court stated it was relying solely on Yee's testimony.  Therefore, we do not consider the unadmitted trial exhibit.

performance may produce." ' [Citations.] [¶] 'Special damages ... represent loss that "occurred by reason of injuries following from" the breach.' [Citations.] 'Special damages for breach of contract are limited to losses that were either actually foreseen [citation] or were "reasonably foreseeable" when the contract was formed.' " (*Moore, supra*, 83 Cal.App.5th at pp. 531–532.)

" 'Lost profits, if recoverable, are more commonly special rather than general damages [citation], and subject to various limitations. Not only must such damages be pled with particularity [citation], but they must also be proven to be certain both as to their occurrence and their extent, albeit not with "mathematical precision." ' " (*Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 754 (*Greenwich*).)

As both sides agree, the substantial evidence standard of review applies to our review of the court's finding that Meritage suffered $3,284,749 in damages due to the delay caused by the defendants' breach of contract. (See *Maneri v. FCA US, LLC* (2025) 116 Cal.App.5th 897, 905 ["the amount of damages is a question of fact reviewed for substantial evidence"]; *Coziahr v. Otay Water Dist.* (2024) 103 Cal.App.5th 785, 820 ["The 'question of whether a plaintiff was, in fact, damaged by the defendant's [conduct] is reviewed for substantial evidence.' "].)

Under the substantial evidence standard of review, "we must determine whether there is evidence that is ' " 'reasonable in nature, credible, and of solid value; [constituting] "substantial" proof of the essentials which the law requires in a particular case.' " ' [Citation.] To do so, we first resolve all explicit conflicts in the evidence and presume all reasonable inferences in favor of the [statement of decision]. [Citation.] We then determine whether evidence supporting the [statement of decision] is substantial. '[T]his does not mean we must blindly seize any evidence in support of the respondent in

20

order to affirm the judgment. The Court of Appeal "was not created ... merely to echo the determinations of the trial court. A decision supported by a mere scintilla of evidence need not be affirmed on review." [Citation.] "[I]f the word 'substantial' [is to mean] anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with 'any' evidence. It must be reasonable ..., credible, and of solid value ...." ' [Citation.] 'The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record. [Citation.] While substantial evidence may consist of inferences, such inferences must be "a product of logic and reason" and "must rest on the evidence" [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding.' " (*Pinto v. Farmers Ins. Exchange* (2021) 61 Cal.App.5th 676, 688–689.)

3. *Application*

We are cognizant that the substantial evidence standard of review is deferential to the findings made by the trier of fact. Even so, and construing the evidence in the light most favorable to the judgment, we cannot affirm the court's finding that Meritage suffered $3,284,749 in damages from its inability to develop its land according to its expected development timeline.

As noted, Meritage did not elicit any expert testimony, or admit any documentary evidence, to substantiate its nearly $3.3 million in claimed damages related to its development delays. Rather, it sought to prove the damages exclusively through the fleeting testimony of one lay witness, Yee. By our estimation, Yee's testimony on Meritage's delay-related damages constitutes a mere six or seven pages of the 1,462-page reporter's transcript.

Yee testified that she ran a revised analysis on Meritage's original pro forma for the project to determine the price Meritage should have paid for

units 7 and 8 to account for the lost profits it incurred due to the three-year delay in its ability to construct residential housing on the land. However, the pro forma was predicated on inherently uncertain assumptions that Meritage had adopted years earlier, before the project even began, rather than the undoubtedly more accurate cost and home value figures that were presumably available to Meritage by the time of trial. When the defense cross-examined Yee about her decision to rely on these remote and inexact pre-project assumptions, Yee candidly explained that she relied on them because it was "easier" to do so. The sheer remoteness of these pre-project assumptions renders them inherently speculative. (See *Greenwich, supra*, 190 Cal.App.4th at p. 764 [years-old property appraisal was too "remote and speculative" to support lost profits award].)

Further, Meritage's counsel did not elicit any testimony from Yee about the facts or assumptions undergirding her opinion that Meritage stood to lose roughly $3.3 million from the delay, apart from the land's original purchase price and the duration of the delay (three years). Counsel did not ask Yee to articulate any of the figures or calculations that went into her analysis, nor did counsel ask her to describe how the figures were derived. Therefore, the *only* evidence supporting the lost profits award is Yee's cursory testimony that Meritage had a plan to make a certain amount of profit, based on various undisclosed assumptions, and a change to one of the assumptions (the project duration) reduced the company's expected profits by $3.3 million. Because Yee provided virtually no testimony concerning the factual basis for her opinion, we must conclude her lay opinion was based on speculation and conjecture. Therefore, the damages awarded for the delay in Meritage's ability to develop the land ($3,284,749) is not supported by substantial evidence, and it cannot stand. (See *Greenwich, supra*, 190 Cal.App.4th at

22

p. 763 ["The existence of plans for a development does not supply substantial evidence that the development is reasonably certain to be built, much less that it is reasonably certain to produce profits."]; see also *Atkins v. City of Los Angeles* (2017) 8 Cal.App.5th 696, 741 ["Because we 'cannot ascertain with any certainty how [the plaintiff's expert] reached her assumption[s]' [citation] regarding the plaintiffs' continued employment with the Department, the award of future economic losses is speculative."].)

" '[W]hen the evidence is sufficient to sustain some, but not all, of a … compensatory damages award, the appellate court may reduce the judgment to the amount supported by the evidence and affirm as modified.' " (*Russell v. Man* (2020) 58 Cal.App.5th 530, 538; see, e.g., *Bermudez v. Ciolek* (2015) 237 Cal.App.4th 1311, 1337–1341 [modifying and affirming judgment where evidence was insufficient to support certain damages awarded to plaintiff].) Thus, in our disposition, we modify the judgment by reducing the compensatory damages award from $4,610,911.40 to $1,326,162.40 (i.e., we shall reduce it by $3,284,749), and affirm the judgment as modified.

IV

DISPOSITION

We modify the judgment by reducing the compensatory damages award from $4,610,911.40 to $1,326,162.40, plus prejudgment and postjudgment interest. We also modify the judgment to state that only Peppertree Village-VII, LLC and Duane Urquhart (not Northern Capital Inc., LLC) are jointly and severally liable for the damages award. As modified, the judgment is affirmed. The parties are to bear their own appellate costs.

McCONNELL, P. J.

WE CONCUR:

DATO, J.

DO, J.